# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| EILEEN BIRNHOLZ, Derivatively on Behalf of FirstEnergy Corp., <br><br> Plaintiff, <br><br> vs. <br><br> H. PETER BURG, ANTHOY J. ALEXANDER, PAUL T. ADDISON, CAROL A. CARTWRIGHT, WILLIAM T. COTTLE, PAUL J. POWERS, GEORGE M. SMART, PARTICK K. WOOLF, ROBERT B. HEISLER, JR., ROBERT L. LOUGHHEAD, JOHN M. PIETRUSKI, CATHERINE A. REIN, ROBERT C. SAVAGE, RUSSELL W. MAIER, ROBERT N. POKELWALDT AND JESSIE T. WILLIAMS, SR., <br><br> Defendants. <br><br> vs. <br><br> FIRSTENERGY CORP., an Ohio corporation <br><br> Nominal Defendant. | CIVIL ACTION NO. 5:03CV1826 <br><br> JUDGE GWIN <br><br> MAG. JUDGE GALLAS <br><br> VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT <br><br> JURY TRIAL DEMANDED |

Plaintiff, by her undersigned attorneys, alleges for her Verified Shareholder Derivative Complaint, based upon, inter alia, the investigation made by and through her attorneys, as follows:

## PRELIMINARY STATEMENT

1. This derivative action arises from the breach of fiduciary duties owed by the directors of FirstEnergy Corp. ("FirstEnergy" or the "Company") to FirstEnergy and its shareholders. The Company's board has engaged in a pattern of neglect and has utterly failed to oversee both the operations and financial reporting of the Company, which has caused, and will continue to cause, material damage to FirstEnergy's financial position and reputation.

2. FirstEnergy has consistently failed to maintain and upgrade its power grid. This failure is the leading cause of the massive blackout that interrupted electric service to some 50 million people on August 14, 2003. The Company's board turned a blind eye to the many warning signs of the dire results of their failure to adequately maintain and upgrade its power lines, such as frequent blackouts in Ohio, a blackout in New Jersey on the July 4, 2003 weekend, and problems resulting from improperly maintained power lines in New Jersey that caused electricity to run through the ground, allowing electric charges to run through residents' pools.

3. The Company's board also failed to properly oversee the operation of FirstEnergy's Davis-Besse nuclear power plant. Ultimately, that plant was closed when serious problems were discovered. The directors allowed the situation to go on until it became "the most serious nuclear plant incident in the nation since the Three Mile Island accident in 1979."

4. Further damage to the Company was caused as a result of the directors' failure to ensure that an adequate financial reporting system was in place at the Company. As a result of that neglect, the Company has recently announced the restatement of its financial results for 2002 and the first quarter of 2003 and shareholders have filed suit against the Company and others for violations of the federal securities laws.

5. Given the directors' numerous conflicts of interest, and failure to institute necessary remedial actions at the Company over an extended period of time, it is quite clear that they will not take any such action against their colleagues and friends on the board and at the Company and will continue to allow the Company to suffer harm without recompense. Such a situation cannot stand and plaintiff brings this action on behalf of FirstEnergy to cause the defendants to account for the damage caused to the Company, to recover such damages for its benefit, and to institute the necessary corrective measures to ensure that such problems do not occur again in the future.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the dispute is between citizens of different States. This action was not brought

collusively to confer jurisdiction on a court of the United States that it would not otherwise have. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, among other things, many of the acts alleged and complained of herein occurred in this District and the Company is headquartered in this District.

## THE PARTIES

1. Plaintiff, a citizen of the State of Florida, has owned shares of FirstEnergy at all times relevant herein.

2. FirstEnergy is a corporation duly organized and existing under the laws of the State of Ohio and maintains its corporate headquarters at 76 South Main Street, Akron, Ohio 44308. FirstEnergy is the holding company of electric utility subsidiaries, including Ohio Edison Company, The Cleveland Electric Illuminating Company, Pennsylvania Power Company, The Toledo Edison Company, American Transmission Systems, Incorporated, Jersey Central Power & Light Company, Metropolitan Edison Company, and Pennsylvania Electric Company. FirstEnergy's revenues are derived primarily from electric service provided by its utility subsidiaries and its other principal subsidiaries: FirstEnergy Solutions Corp.; FirstEnergy Facilities Services Group, LLC; MYR Group Inc.; MARBEL Energy Corporation; GPU Capital, Inc.; and GPU Power, Inc. The Company owns other subsidiaries including: FirstEnergy Properties, Inc., FirstEnergy Ventures Corp., FirstEnergy Nuclear Operating Company, FirstEnergy Securities Transfer Company, GPU Diversified Holdings, LLC, GPU Telecom Services, Inc., GPU Nuclear, Inc., FirstEnergy Service Company, GPU Service, Inc., and GPU Advanced Resources, Inc.

3. Defendant H. Peter Burg ("Burg") is the Chairman, and Chief Executive Officer of FirstEnergy.

4. Defendant Anthony T. Alexander ("Alexander") is the President and Chief Operating Officer of FirstEnergy.

5. Defendant Paul T. Addison ("Addison") is a member of the Company's Board of Directors.

6. Defendant Carol A. Cartwright ("Cartwright") is a member of the Company's Board of Directors.

7. Defendant William T. Cottle ("Cottle") is a member of the Company's Board of Directors.

8. Defendant Paul J. Powers ("Powers") is a member of the Company's Board of Directors.

9. Defendant George M. Smart ("Smart") is a member of the Company's Board of Directors.

10. Defendant Patricia K. Woolf ("Woolf") is a member of the Company's Board of Directors.

11. Defendant Robert B. Heisler, Jr. is a member of the Company's Board of Directors.

12. Defendant Robert L. Loughhead ("Loughhead") is a member of the Company's Board of Directors.

13. Defendant John M. Pietruski ("Pietruski") is a member of the Company's Board of Directors.

14. Defendant Catherine A. Rein ("Rein") is a member of the Company's Board of Directors.

15. Defendant Robert C. Savage ("Savage") is a member of the Company's Board of Directors.

16. Defendant Russell W. Maier ("Maier") is a member of the Company's Board of Directors.

17. Defendant Robert N. Pokelwaldt ("Pokelwaldt") is a member of the Company's Board of Directors.

18. Defendant Jesse T. Williams, Sr. ("Williams") is a member of the Company's Board of Directors.

19. The defendants, by reason of their status as officers and executives or members of the FirstEnergy Board of Directors have at all relevant times had the power and influence and did

in fact control and influence and cause FirstEnergy to engage in the unlawful acts and conduct complained of herein.

20. Each of the defendants is liable as a direct participant in, and aider and abetter of, the wrongs complained of herein.

21. By reason of their positions and because of their ability to control the business and corporate affairs of FirstEnergy at all relevant times, the Defendants owe and have owed FirstEnergy and its shareholders fiduciary obligations of fidelity, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage FirstEnergy in a fair, just, and equitable manner; act in furtherance of the best interests of FirstEnergy and its shareholders so as to benefit all shareholders and not in furtherance of their personal interest or to benefit themselves; and act with complete candor toward the public shareholders. In addition, each director of FirstEnergy owes and has owed to FirstEnergy and its shareholders the fiduciary duties to exercise due care and diligence in the administration of the affairs of FirstEnergy and in the use and preservation of its property and assets, and the highest obligations of good faith and fair dealing.

22. In addition, the defendants serving on the Company's Audit Committee including Smart (Chairman), Loughhead, Maier, Pokelwaldt and Rein, were charged with specific oversight responsibilities. As set forth in the Company's Proxy Statement, dated April 9, 2003 (the "2003 Proxy"), those responsibilities included overseeing the Company's financial reporting process on behalf of the Board of Directors. In fulfilling its oversight responsibilities, the Audit Committee reviewed and discussed with management the audited financial statements to be included in the Company's Annual Report on Form 10-K for the year ended December 31, 2002. In performing its review, the Committee discussed the propriety of the application of accounting principles by the Company, the reasonableness of significant judgments and estimates used in the preparation of the financial statements, and the clarity of disclosures in the financial statements. The Audit Committee also reviewed and discussed with the Company's independent auditors, PricewaterhouseCoopers LLP ("PWC"), their opinion on the conformity of the audited financial statements with Generally Accepted Accounting Principles ("GAAP"). Based on the reviews

and discussions conducted, the Audit Committee recommended to the Board of Directors that the audited financial statements be included in the Company's Annual Report on Form 10-K for the year ended December 31, 2002, for filing with the Securities and Exchange Commission ("SEC").

23. The defendants serving on the Company's Compensation Committee during the relevant time period including Pietruski (Chairman), Cartwright, Heisler, Powers, Rein and Smart, were charged with specific responsibilities. As set forth in the 2003 Proxy, those responsibilities included recommending to the Company's Board of Directors the compensation for the five highest paid executive officers, reviewing and endorsing a compensation philosophy that supports competitive pay for performance and is consistent with the corporate strategy, and assisting the Board in establishing appropriate incentive compensation and equity based plans.

24. The defendants serving on the Company's Corporate Governance Committee including Cartwright, Woolf, Heisler, and Williams, were charged with specific responsibilities. As set forth in the 2003 Proxy, those responsibilities included the development, administration, and recommendation to the Company's Board of Directors of the corporate governance principles.

25. The defendants serving on the Company's Finance Committee including Powers, Loughhead, Pietruski, Savage, and Pokelwaldt, were charged with specific responsibilities. As set forth in the 2003 Proxy, those responsibilities included the monitoring and overseeing of the Company's financial resources, and strategies, reviewing dividend policy, capital structure policies, long-and short-term debt levels, the issuance of securities and other appropriate financial matters, and approving terms of sales of Company securities when the Board does not exercise such powers. The Finance Committee also reviews the Company's financial forecasts, budgets, pension fund investments and corporate insurance coverage.

26. The defendants serving on the Company's Nuclear Committee including Woolf, Savage, Maier, and Williams, were charged with specific responsibilities. As set forth in the 2003 Proxy, those responsibilities included monitoring and consulting with both management and the Board of Directors regarding nuclear matters, including the operation of all nuclear units

in which any subsidiary of the Company has an ownership or leasehold interest. The Nuclear Committee reviews the safety, reliability and quality of nuclear operations and the effectiveness of management systems for the identification of problems and potential problems.

27. FirstEnergy's non-employee directors receive lucrative compensation for their service on FirstEnergy's board. Non-employee directors receive an annual retainer consisting of $30,000 in cash, which a director may elect to receive in common stock or to defer into either cash or stock, and $40,000 in equity in the form of common stock, which may be deferred; $1,500 for each Board and Committee meeting attended; a fee of up to $1,500 for each day the director visits a Company office or facility, other than an office or facility at which a meeting of the Board or Committee of which the director is a member is held on such day, or attendance at an industry meeting at the request of the Company in connection with fulfilling the director's responsibilities as a director or member of a Committee; and reimbursement for expenses related to attending meetings. In addition, the chair of each Committee receives an additional retainer of $5,000.

28. The Defendants, because of their positions of control and authority as executive officers and/or directors of FirstEnergy, were able to and did, directly and indirectly, control the matters and transactions complained of herein. These defendants have and have had the duty to exercise reasonable control and supervision over the officers, employees, agents, business and operations of the Company; to be and remain informed as to how the Company was operating and, upon receiving notice or information of an imprudent, questionable or unsound decision, condition, or practice, make reasonable inquiry and, if necessary, make all reasonable remedial efforts; and to conduct the affairs of the Company to provide the highest quality services and maximize the profitability of the Company for the benefit of its shareholders.

## SUBSTANTIVE ALLEGATIONS

1. On August 14, 2003, the United States experienced the greatest blackout in its history. The New York Times reported on August 25, 2003 that information reviewed as part of governmental investigations into the cause of the blackout, including second-by-second data on the conditions of some lines and records of conversations among grid operators, points to

00000543
7

northern Ohio as the place where the troubles began and, in particular, the transmission territory of FirstEnergy. Indeed, on August 20, 2003, The Wall Street Journal quoted Ohio Representative, Dennis Kucinich as stating he would file a petition before the Public Utilities Commission of Ohio to revoke FirstEnergy's operating licence, citing "mismanagement and a climate of putting profit above public interest."

2. The blackout is but the latest example of neglect and poor management by FirstEnergy. A pattern of neglect by the Company, its management and board is laid bare in an August 22, 2003 article in The New York Times. One such extreme example is the shutdown of the Davis-Besse power plant ("Davis-Besse") more than a year ago.

3. At Davis-Besse, boric acid had seeped through cracks in plant control rods that pass through to the highly radioactive zone, where superpressurized water is used to cool the plant while it is creating energy. Investigators found that the acid had eaten through the carbon steel part of the reactor vessel head, leaving only a thin stainless steel lining intact. Yet a backup system intended to cool the nuclear fuel in the event of a breach in the reactor vessel was handicapped because an undersize drainage screen could easily become blocked. The situation at Davis-Besse is now widely considered "the most serious nuclear plant incident in the nation since the Three Mile Island accident in 1979."

4. Even after Davis-Besse closed in early 2002, problems have continued. In March 2002, five members of a maintenance crew repairing the steam generators left the plant with microscopic radioactive particles on their clothes, carrying them to new job sites in South Carolina and Virginia. At least three former Davis-Besse employees have filed complaints this year with the Department of Labor contending that they were fired by First Energy after raising concerns about problems at Davis-Besse, including one who said managers stopped his effort to clean the acid corrosion in 2000 so the reactor could be restarted on schedule.

5. In the months after the closure of Davis-Besse, federal investigators and even FirstEnergy officials agreed that employees felt intimidated about raising safety problems. "They had a lot of warning signs that they either overlooked or downplayed," said David

Lochbaum a nuclear safety engineer with the Union of Concerned Scientists, who interviewed staff at the plant.

6. Moreover, the August 22 article reported that FirstEnergy's New Jersey subsidiary has come under fire for frequent blackouts, for inadequate maintenance and for allowing stray electricity to run through the ground, leaving residents of Brick, New Jersey, "tingling" when they step into pools and Jacuzzis. Investigators determined that deteriorated power lines owned and operated by FirstEnergy and improper grounding combined with the extremely dry conditions were the most likely culprits and that it was a problem throughout the neighborhood. This same section of New Jersey was outraged this summer when a power failure on the July Fourth weekend left thousands of vacationers without power.

7. Furthermore, the August 22 article reported that in northern Ohio mayors have complained to state regulators that power failures by FirstEnergy have become more frequent and longer, forcing some to buy diesel-powered generators for municipal buildings. The company has been responsible for more blackouts in Ohio already this year than all of last year. This has been the result of the Company's failure to upgrade its transmission system. In the three years since deregulation legislation passed in Ohio, FirstEnergy's spending on maintaining its high-voltage transmission lines in Ohio has remained all but flat. The decision not to increase such spending came as industry groups and government regulators were warning that the grid system in the Midwest, including FirstEnergy's territory, could become a choke point in a summer power surge.

8. The August 22, 2003, article quoted State Senator Eric D. Fingerhut as stating, "This has always been a utility that has dug in and supported the status quo, not wanting to modernize, not wanting to make investments."

9. FirstEnergy's failures with regard to the blackout are particularly egregious in light of the fact, as revealed in an August 21, 2003 article in The New York Times, that three months before the blackout the agency charged with protecting the nation's electrical grid, the North American Electric Reliability Council, put industry officials on notice that the section of the grid covering Ohio and other parts of the Midwest was particularly vulnerable to the kind of

"cascading events" that occurred. The mention in the report of potential cascading power failures in the region was a significant warning. "Our reliability assessments don't mention problems lightly," the article quoted Ellen Vancko, a spokeswoman for the group, as stating.

10. An article in the August 24, 2003 edition of The New York Times reveals that FirstEnergy has not only ignored regulators' warnings that its antiquated grid could falter, but that it has also ignored shareholder demands that its executives improve the company's governance practices. The persistent dismissal of shareholders' concerns about its "entrenched board" is one of the numerous signs of complacency by the Company, its management and board of directors.

11. The August 24 article notes that seven times since 1999, a majority of the Company's shareholders voted for changes in corporate governance, and in each case FirstEnergy failed to respond at all. This year, more than half of its voting shareholders favored rescinding the "poison pill" that prevents an unfriendly takeover and favored changing the Company's staggered board structure.

12. FirstEnergy directors serve three year terms, i.e., only one-third of the board is elected each year. A majority of the shareholders have voted four times to have all of the directors elected each year. The board continuity caused by FirstEnergy's current policy has, according to the proposals, made the board "too chummy." Ten of FirstEnergy's directors have been on the board or one of its units for 10 years or more.

13. The mismanagement of FirstEnergy extended well past its basic operations to its financial reporting. On August 5, 2003, the Company reported that it would have to restate its financial results for fiscal year 2002 and the first quarter of 2003 to reflect implementation of changed accounting treatments regarding the recovery of transition assets in Ohio and recognition of above-market values of certain leased generation facilities. The Company stated that the restatements will reflect non-cash expenses only and are expected to reduce FirstEnergy's earnings per share by $0.23 to $1.92 ($1.91 diluted) for 2002, and are expected to lower the Company's 2003 earnings by $0.17 per share compared with the Company's original guidance. On August 19, 2003, the Company announced that the restatement had been

performed and restated its 2002 earnings downward by $76.5 million, or $0.26 per share ($0.03 more than announced a mere two weeks earlier). As a result of this restatement, shareholders have brought suit causing the Company even further damage.

## DERIVATIVE ALLEGATIONS

1. Plaintiff brings this complaint derivatively in the right and for the benefit of FirstEnergy to redress injuries suffered and to be suffered by FirstEnergy as a direct result of the violations of fiduciary and other common law duties by the defendants to FirstEnergy and its public shareholders.

2. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

3. Plaintiff will adequately and fairly represent the interests of FirstEnergy and its public shareholders in enforcing and prosecuting their rights.

4. Plaintiff has not made any demand on the Board of Directors of FirstEnergy to institute this action because such demand would be a futile and useless act for the following reasons:

   (i) The FirstEnergy Board has proven itself to be unwilling to bring remedial action against wrongdoers that have caused the Company substantial harm regarding conduct of which the Board was aware;

   (ii) The Board has made no effort to recover any portion of the damages caused by the closure of Besse-Davis and the related employee complaints from those responsible;

   (iii) The acts complained of herein constitute violations of fiduciary and common law duties owed by FirstEnergy's Board of Directors and these acts are incapable of ratification;

   (iv) The defendants intentionally breached and/or recklessly and/or negligently disregarded their fiduciary duties, choosing not to address the matters raised by the investigations into Besse-Davis, and the power line situation in New Jersey;

   (v) The Board has systematically failed to exercise oversight over the Company and its employees;

   (vi) The Board has failed to ensure that an adequate corporate information and reporting system exists at FirstEnergy;

(vii) The Board has failed to commence any action against the principal wrongdoers despite the lengthy passage of time since their fraudulent and criminal acts were revealed;

(viii) The Board is "entrenched" and has consistently acted in an antagonistic fashion to any proposal that challenges them;

(ix) The acts complained of herein are illegal and unreasonable and, thus, are acts incapable of ratification;

(x) In order to bring this action for breach of fiduciary and common law duties, the members of the FirstEnergy Board of Directors would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, with whom they are well acquainted and with whom they have entangling alliances, interests, and dependencies, which they would not do. They, therefore, would not be able to vigorously prosecute any such actions; and

(xi) The members of the FirstEnergy Board of Directors, including each of the defendants herein, receive substantial benefits, and other emoluments by virtue of their membership on the Board and their control of FirstEnergy. Bringing an action or even adequately investigating other directors, who have the power to terminate a director's employment, would not likely occur. The defendants are incapable of exercising independent objective judgment in deciding whether to bring this action.

5. The defendants have numerous conflicts of interest and entangling alliances that make it clear that they cannot vigorously prosecute an action against the principal wrongdoers:

(i) Ten of the Company's 16 directors have been on its board or one of its units for 10 years or more;

(ii) Many of the defendants have previously served as directors of Ohio Edison, including Cartwright (1992-1997), Powers (1992-1997), Smart (1988-1997), Loughhead (1980-1997), Alexander, Burg (since 1989), Maier (1995-1997), and Williams (1992-1997);

(iii) Many of the defendants have previously served as directors of GPU, including Woolf (1983-2001), Pietruski (1989-2001), Rein (1989-2001), and Pokelwaldt (2000-2001);

(iv) Defendant Heisler is the Executive Vice President of KeyCorp, a financial services company, of which defendant Cartwright is a director;

(v) Defendant Addison is the Managing Director of Salomon Smith Barney. Salomon Smith Barney, however, was the co-lead arranger on FirstEnergy's November 2002 renewal of its $1 billion 364-day credit facility. Further, in April 2002, Salomon Smith Barney was a co-manager

of the securitization of approximately $320 million worth of stranded costs by Jersey Central Power & Light Company, a subsidiary of GPU Inc., which had merged with FirstEnergy the previous fall. Moreover, Salomon Smith Barney acted as the financial adviser for GPU Inc. in its merger with FirstEnergy; and

(vi) Defendant Rein is a director of The Bank of New York. The Bank of New York participated in the $1 billion 364-day revolving credit facility closed by FirstEnergy in November 2002. Further, The Bank of New York was a co-documentation agent for a $421 million letter of credit facility backing sale and leaseback structures for three FirstEnergy subsidiaries in March 2002.

6. Plaintiff has not made demand on the shareholders of FirstEnergy to institute this action because FirstEnergy, according to its Annual Report to Shareholders for the year ended December 31, 2002 (the "Annual Report"), has 162,762 holders of record of 297,636,276 shares of the Company's stock as of January 31, 2003. Making demand on such a massive number of individuals, presumably located in different geographic locations throughout the United States, would be prohibitively expensive, and unduly burdensome. Further, FirstEnergy's most recent shareholder meeting was held on May 20, 2003. To wait until the Company's next shareholder meeting would entail a lengthy delay and the potential expense of a heated proxy fight. Moreover, such a delay might place the claims sought to be instituted in jeopardy due to statute of limitations issues.

## COUNT I

### (Breach of Fiduciary Duties)

1. Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

2. Each defendant owed FirstEnergy and its public shareholders the highest duties of loyalty, honesty, and care in conducting their affairs.

3. At a minimum, to discharge these duties, each defendant should have exercised reasonable and prudent supervision over the management, policies, practices, controls and financial affairs of FirstEnergy. By virtue of these obligations, each defendant was required, inter alia:

(i) to exercise reasonable control and supervision over the officers, employees, agents, business, and operations of FirstEnergy;

(ii) to be and remain informed as to how FirstEnergy was operating and, upon receiving notice or information of an imprudent, questionable, or unlawful decision, condition, or practice, make reasonable inquiry and, if necessary, make all reasonable remedial efforts; and

c. to conduct the affairs of FirstEnergy in a lawful manner and in compliance with government rules and regulations.

4. The defendants knowingly, intentionally, recklessly or negligently breached their fiduciary duties and, thereby, caused the Company to commit illegal and criminal acts, waste its assets, and impair its reputation and credibility for no legitimate business purpose, as a result of which FirstEnergy has been and continues to be substantially damaged.

5. Accordingly, plaintiff seeks on behalf of FirstEnergy monetary damages, injunctive remedies, and other forms of equitable relief.

## COUNT II

### (Indemnification)

1. Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

2. As alleged herein, the defendants, acting as officers and/or directors of FirstEnergy and, therefore, as its agents, breached their fiduciary duties to FirstEnergy and its public shareholders.

3. FirstEnergy has suffered significant and substantial injury as a direct result of the defendants' knowing, intentional, or reckless breaches of their fiduciary duties as alleged herein. Plaintiff, on behalf of the Company, seeks relief from the defendants on the theory of indemnity for all damages that occurred as a result of defendants' violations of their fiduciary duties.

## COUNT III

### (Recovery Under the Sarbanes-Oxley Act)

1. Plaintiff realleges and incorporates by reference each and every allegation contained above.

2. This claim is brought under Section 304 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") against defendants Burg and Alexander.

3. FirstEnergy is restating its earnings for the year 2002 and the first quarter of 2003. As such, FirstEnergy failed to comply with financial reporting requirements under the securities laws.

4. Defendants Burg and Alexander, as senior officers during the time of the of the first public issuance or filing with the SEC of the financial documents embodying the financial information that required restatement, shall reimburse the Company for the bonuses or other incentive-based or equity-based compensation received during the 12 month time period following such first public issuance or filing of the filing information that required restatement.

**WHEREFORE**, plaintiff prays for judgment as follows:

A. Declaring that the defendants have breached their fiduciary duties as alleged herein;

B. Directing defendants, jointly and severally, to remit to FirstEnergy all damages caused to the Company and to account for all losses and/or damages sustained by FirstEnergy by reason of the acts and omissions complained of herein;

C. Requiring defendants to remit to FirstEnergy all of their salaries, fees, stock awards, and other compensation received for the periods when they breached their duties;

D. Ordering that defendants and those under their supervision and control refrain from further violations as are alleged herein and to implement corrective measures that will rectify all such wrongs as have been committed and prevent their recurrence;

E. Awarding pre-judgment and post-judgment interest as allowed by law;

F. Awarding plaintiff's attorneys' fees, expert fees, consultant fees, and other costs and expenses; and

G. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues.

DATED: August 29, 2003

          CHERNETT WASSERMAN &ARGER
          & PASTERNAK LLC

         By: _____
          Jonathon M. Yarger
          Michael B. Pasternak
          The Tower at Erieview
          1301 East 9th Street, Suite 3300
          Cleveland, Ohio 44114
          Telephone: 216-737-5000
          Facsimile: 216-737-0011
          E-Mail: jmy@cwyplaw.com

         WEISS & YOURMAN
         Joseph H. Weiss
         David C. Katz
         551 Fifth Avenue, Suite 1600
         New York, NY 10176
         Telephone: (212) 682-3025

         STULL, STULL & BRODY
         Jules Brody
         6 East 45th Street
         New York, New York 10017
         (212) 687-7230

         Attorneys for Plaintiff

## VERIFICATION

I, Eileen Birnholz, declare as follows: I am the named plaintiff in the action herein; I have read the annexed Verified Shareholder's Derivative Complaint, know the contents thereof and the same are true and accurate to the best of my personal knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: August 26, 2003

_____
EILEEN BIRNHOLZ