**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE FIRST ENERGY SHAREHOLDER DERIVATIVE LITIGATION | ) CASE NO. 5:03-CV-1826 |
| | ) |
| This Document Relates to: All Cases | ) Judge James S. Gwin |
| | ) |
| | ) VERIFIED CONSOLIDATED |
| | ) AMENDED DERIVATIVE |
| | ) COMPLAINT |

Lead Plaintiffs, by and through their attorneys, hereby submit this Verified Consolidated Amended Derivative Complaint (the "Complaint") against the defendants named herein:

**PRELIMINARY STATEMENT**

1.     Lead Plaintiffs file this derivative suit on behalf of FirstEnergy Corporation ("FirstEnergy" or the "Company") against the members of its Board of Directors (the "Board" or the "Directors"), seeking to remedy defendants' breaches of fiduciary duties, gross mismanagement, waste of corporate assets, and unjust enrichment.  The conduct of the Directors has resulted in:  (i) the most serious nuclear plant incident since the Three Mile Island accident in 1979, for which the Company has incurred more than $500 million in remedial costs; (ii) the largest electrical blackout in United States history; (iii) a restatement of earnings; (iv) an investigation by the Securities and Exchange Commission (the "SEC"); (v) a grand jury investigation; (vi) an investigation by the Nuclear Regulatory Commission ("NRC"); (vii) the filing of a complaint before the Public Utilities Commission of Ohio to revoke FirstEnergy's operating license; (viii) an investigation by the Pennsylvania Public Utilities Commission; and (ix) a downgrading of the Company's credit rating to the lowest investment grade rating.

2.     In March 2002, it was first revealed to the public that FirstEnergy employees found cracks in parts of a critical safety mechanism in the head of FirstEnergy's Davis-Besse

Nuclear Power Station ("Davis-Besse") reactor vessel.  It was later revealed that the Company allowed boric acid to eat a football sized hole through over six inches of the carbon steel reactor head.  According to the director of the Reactor Project for the Nuclear Information and Resource Center, "FirstEnergy pushed this reactor beyond all reasonable safety margins . . . ."  In July 2002, the Company admitted to NRC officials that "poor management" was a contributing factor to the major corrosion problem found at Davis-Besse.

3.     FirstEnergy not only failed to correct the dangerous conditions at Davis-Besse, but it also lied to and misled the NRC regarding Davis-Besse.  For example, Davis-Besse photographs and videotapes revealed corrosion, including a photograph that became known as the "Red Photo," showing rust-colored boric acid corrosion leaking from inspection ports on the reactor's dome.  Instead of revealing this information, FirstEnergy told the NRC that no known problems existed and provided the NRC with some photographs of the reactor head, but omitted the Red Photo.  FirstEnergy likewise withheld a lead engineer's report describing how he was given insufficient time to inspect the reactor head despite his findings of hardened "lava-like" boric acid.

4.     Ultimately, the plant was closed when serious maintenance problems were discovered, forcing the Company to spend over $500 million on repairs, shutdown costs, and the purchase of replacement energy, while the plant remained (and continues to remain) idle.

5.     The Directors were kept apprised of the problems at Davis-Besse by the Nuclear Committee of the Board, of which defendants Maier, Savage, Williams and Woolf are members.  In addition, defendant Alexander has been named as a source of FirstEnergy's operational problems.  One analyst explained, "[f]inancially, the company has performed . . . Operationally, it's a disaster.  That points to Tony Alexander."  Despite Alexander's failures, the Board recently

appointed him as FirstEnergy's Chief Executive Officer, leading an informed commentator to state:  "The [B]oard has really failed its shareholders and the industry by not recruiting the external leadership that the company needs right now."

6.     Defendants' breaches of their fiduciary duties also resulted in the massive blackout that interrupted electricity service to some 50 million people on August 14, 2003.  The Board ignored repeated and easily detectable warning signs that the Company's power lines were inadequately maintained and severely decayed, such as frequent blackouts in Ohio, a blackout in New Jersey during the July 4, 2003 weekend, and reports that power lines in New Jersey had caused electricity to run through the ground, allowing electric charges to seep into residents' pools.

7.     Three months prior to the blackout, the agency charged with protecting the nation's electrical grid put industry officials including FirstEnergy on notice that the section of the grid covering Ohio and other parts of the Midwest were particularly vulnerable to the kind of "cascading events" that occurred.

8.     Shortly after the blackout, the *New York Times* noted that FirstEnergy had not only ignored regulators' warnings that its antiquated grid could falter, but it also ignored shareholder demands that its executives improve the Company's governance practices.

9.     Indeed, at least six times since 1999, a majority of the Company's shareholders voted for changes in corporate governance, and in each case the Board failed to respond.  In addition, in 2003, more than half of FirstEnergy's voting shareholders favored rescinding the "poison pill" that prevents an unfriendly takeover and favored changing the Company's staggered board structure, despite the Board's recommendations against the proposals. Moreover, the Board's repeated failure to institute adequate financial and operational controls

3

over an extended period of time after numerous warnings of the deficiencies is evidence that the Board will not take any action against their colleagues and close friends on the Board and will continue to allow the Company to suffer harm without recompense.

10.    On August 18, 2003, a class action lawsuit on behalf of people damaged by the massive August 14 blackout was filed.  The complaint charges FirstEnergy with recklessly causing the blackout by:  (i) failing to have a functioning alarm that could have timely alerted controllers to trouble with its power lines; (ii) failing to cut back tree limbs that came into contact with power lines, which resulted in the tripping of the power lines; and (iii) failing to maintain a failsafe system that could have isolated the local power grid from the nationwide network.  By disregarding these basic and fundamental industry practices, the Board has exposed the Company to billions of dollars of potential liabilities.

11.    Further damage to the Company was caused by the Directors' failure to ensure that an adequate financial reporting system was in place at the Company.  Consequently, on August 5, 2003, the Company announced the restatement of its financial results for 2002 and the first quarter of 2003.  The Company's improper accounting during 2002 caused FirstEnergy's earnings to be artificially inflated by more than $0.26 per share, representing more than 10% of the Company's reported earnings.  Based on the Company's artificial inflation of earnings, shareholders filed class action suits against the Company and senior management for violations of the federal securities laws.  This litigation has forced the Company to incur significant legal expenses and could result in millions of dollars in liabilities for the Company.

12.    On August 20, 2003, United States Representative Dennis Kucinich filed a complaint before the Public Utilities Commission of Ohio to revoke FirstEnergy's operating license, due to "mismanagement and a climate of putting profit above public interest."

4

Moreover, on January 16, 2004, the Pennsylvania Public Utilities Commission launched an investigation of Metropolitan Edison Company, Pennsylvania Electric Company, and Pennsylvania Power Company (all subsidiaries of FirstEnergy), because their service reliability "may have fallen below established standards." These regulatory actions could result in the loss of millions of dollars in revenues for the Company.

13.     Lead Plaintiffs have not made a pre-suit demand on the Board because such an act would have been futile. As set forth in further detail herein, the Board is entrenched and the Directors are marred with conflicts of interest, including: (i) *all* of the present Directors are defendants in this action; (ii) ten of the fifteen Directors have been members of the Board or one of its units for 10 years or more; (iii) each of the Directors knew of and participated in the wrongful conduct; (iv) there are ongoing criminal investigations into the conduct at FirstEnergy, including investigations by the grand jury, the NRC and the SEC; (v) the Board has repeatedly ignored shareholder demands for improved corporate governance; (vi) the Directors maintain substantial stock holdings in FirstEnergy; (vii) there are numerous intertwining board memberships and relationships among the Directors; (viii) defendant Rein is a director of the Bank of New York, which has a banking relationship with FirstEnergy; (ix) defendant Addison was a Managing Director at CitiGroup, with which FirstEnergy has an extensive banking relationship; (x) defendant Cartwright is the President of Kent State University, with which FirstEnergy has a Master Energy Services Agreement and to which First Energy Foundation has donated hundreds of thousands of dollars; (xi) defendant Smart is a former director of Belden & Blake Corp., a subsidiary of which was acquired by FirstEnergy; (xii) defendant Heisler is an executive of KeyCorp, with whom FirstEnergy has had an extensive business relationship; (xiii) eleven of the fifteen Directors have previously served as directors of one of the Company's

5

subsidiaries; and (xiv) FirstEnergy's director and officer liability insurance policy bars insurance coverage if the Directors bring this suit against themselves and other directors.  In sum, and as discussed in greater detail below, pre-suit demand on the entrenched and conflict-marred FirstEnergy Board would have been futile.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the dispute is between citizens of different states.  This action was not brought collusively to confer jurisdiction on a court of the United States that it would not otherwise have.

15.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the Company has its principal place of business in this District and is incorporated in Ohio.  Further, Lead Plaintiffs' causes of action arose in this District and FirstEnergy has suffered and will continue to suffer harm in this District

## THE PARTIES

16.    Lead Plaintiff Teachers' Retirement System of Louisiana ("Louisiana Teachers") is, and was, an owner and holder of FirstEnergy common stock at times relevant hereto, including at the time of the transactions of which it complains.  Louisiana Teachers currently owns more than 150,000 shares of FirstEnergy common stock and will fairly and adequately represent the interests of similarly situated shareholders in enforcing rights of FirstEnergy. Louisiana Teachers is a public trust fund organized under the laws of the State of Louisiana.

17.    Lead Plaintiff Dr. Joseph Scheller ("Dr. Scheller") is, and was, an owner and holder of FirstEnergy common stock at times relevant hereto, including at the time of the transactions of which he complains.  Dr. Scheller will fairly and adequately represent the

interests of similarly situated shareholders in enforcing rights of FirstEnergy.  Dr. Scheller is a citizen of the State of Maryland.

18.     Nominal Defendant FirstEnergy is a corporation duly organized under the laws of the State of Ohio and maintains its corporate headquarters at 76 South Main Street, Akron, Ohio, 44308.  FirstEnergy is the holding company of electric utility subsidiaries, including Ohio Edison Company, The Cleveland Electric Illuminating Company, Pennsylvania Power Company, The Toledo Edison Company, American Transmission Systems, Inc., Jersey Central Power & Light Company, Metropolitan Edison Company, and Pennsylvania Electric Company. FirstEnergy's revenues are derived primarily from electric service provided by its utility subsidiaries and its other principal subsidiaries:  FirstEnergy Solutions Corp.;  FirstEnergy Facilities Services Group, LLC; MYR Group Inc.; MARBEL Energy Corporation; GPU Capital, Inc.; and GPU Power, Inc.  The Company owns other subsidiaries including:  FirstEnergy Properties, Inc.;  FirstEnergy Ventures Corp.;  FirstEnergy Nuclear Operating Company; FirstEnergy Securities Transfer Company; GPU Diversified Holdings, LLC; GPU Telecom Services, Inc.; GPU Nuclear, Inc.; FirstEnergy Service Company; GPU Services, Inc.; and GPU Advanced Resources, Inc.  The Company's subsidiaries and affiliates are involved in the generation, transmission, and distribution of electricity, exploration, and production of oil and natural gas, transmission and marketing of natural gas, and energy management, and other energy-related services.

19.     Defendant Anthony T. Alexander ("Alexander") is FirstEnergy's President and Chief Executive Officer ("CEO").  Alexander has served as the Company's President since 2001, and served as the Company's Chief Operating Officer ("COO") from 2001 to December 22, 2003, when he began serving as interim CEO.  In the wake of the death of H. Peter Burg on

January 13, 2004, the Board appointed Alexander as CEO on January 20, 2004. Alexander has been a director of FirstEnergy since 2000. Alexander has also been a long-time director of various FirstEnergy subsidiaries, including Ohio Edison since 1989, and Pennsylvania Power, The Illuminating Company, Toledo Edison, Metropolitan Edison, and Pennsylvania Electric.

        a.      Alexander's principal professional occupation is his employment with the Company. He has been employed by FirstEnergy or one of its predecessor companies for 32 years, beginning in Ohio Edison's tax department in 1972. He became a staff lawyer in 1976 and General Counsel in 1989. He was Senior Vice President in 1991, then Executive Vice President in 1996, just prior to the 1997 merger of Ohio Edison and Centerior Energy that created FirstEnergy. At FirstEnergy he has been responsible for business development, communications, governmental affairs, legal, marketing, national sales, energy sales, and power marketing groups. Alexander received, $773,292, $917,189, and $925,877 in salary and bonus compensation in 2002, 2001, and 2000, respectively, and nearly $2.0 million in long-term compensation restricted stock during that time. In addition, in early 2002, Alexander sold 40,000 shares of FirstEnergy common stock, or approximately 27% of his holdings, for proceeds of over $1.5 million.

        b.      As of February 28, 2003, Alexander beneficially owned 176,967 shares of FirstEnergy common stock and held 47,091 deferred shares and common stock.

        c.      Alexander has been named as a source of FirstEnergy's operational problems. For example, analyst Robert Rubin at New York-based Deutsche Bank told the *Akron Beacon Journal* in November 2003 that "[f]inancially, the company has performed . . . . Operationally, it's a disaster. That points to Tony Alexander."

d.      Alexander's influence over the remainder of the Board is evident from the fact that, rather than recruiting external leadership when FirstEnergy's former CEO passed away, the Board simply appointed insider Alexander.   According to *The Plain Dealer*, executive recruiting firms have explained that the Board's quick appointment of Alexander is a "lost opportunity," and that "[t]he board has really failed its shareholders and the industry by not recruiting the external leadership that the company needs right now."

20.      Defendant Paul T. Addison ("Addison") has been a director of FirstEnergy since 2003.  From 1997 to 2002, Addison was a Managing Director at CitiGroup Capital Markets, Inc. f/k/a Salomon Smith Barney, Inc. ("CitiGroup"), with whom FirstEnergy has an extensive banking relationship, as set forth in detail herein.

21.      Defendant Carol A. Cartwright ("Cartwright") has been a director of FirstEnergy since 1997, and was a director of subsidiary Ohio Edison from 1992 to 1997.

a.      From at least 1997 to 1998, Cartwright was also a director of Republic Steel, of which defendant Maier was an Executive Vice President and COO.  Since 1991 she has been a director of KeyCorp, of which defendant Heisler is the Executive Vice President, or KeyBank, of which defendant Heisler is Chairman of the Board and CEO.

b.      Since 1991, Cartwright has been President of Kent State University, with which FirstEnergy has a Master Energy Services Agreement pursuant to which FirstEnergy serves as Kent State's energy manager, and to which First Energy Foundation has donated hundreds of thousands of dollars over the past three years.  Cartwright is also a director of Davey Tree Expert Company, a commercial grounds and tree management company that removes trees and vegetation out of the way of power lines for utility companies.

9

c.      Cartwright is a member of the Compensation Committee of FirstEnergy's Board which is responsible for recommending the compensation of the five highest paid executive officers, reviewing and endorsing a compensation philosophy that supports competitive pay for performance and is consistent with the corporate strategy, and assisting the Board in establishing appropriate incentive compensation and equity based plans.

d.      Cartwright is a member of the Corporate Governance Committee of FirstEnergy's Board which is responsible for the development, administration, and recommendation to the Board of the Company's corporate governance.

e.      As of February 28, 2003, Cartwright held 14,208 shares of FirstEnergy common stock.

22.     Defendant William T. Cottle ("Cottle") has been a director of FirstEnergy since 2003.

a.      Cottle has substantial prior experience working for nuclear power projects. For example, Cottle worked with the Tennessee Valley Authority's ("TVA") nuclear program from 1980 to 1987, first as a site director at Watts Bar, and then as an assistant to the agency's manager of nuclear power.  According to the *Houston Chronicle,* TVA's nuclear program (like FirstEnergy's), "suffered serious accidents, billions of dollars in cost overruns and far-reaching labor strife," and Cottle shared responsibility for TVA's "notorious and still-unopened Watts Bar plant from 1982 to 1985," as hundreds of workers alleged they had been intimidated and harassed for reporting safety problems.

b.      Cottle also worked for Houston Lighting & Power Company's ("HL&P") nuclear program where he managed HL&P's South Texas nuclear plant, and for Entergy Operations Inc. where he was in charge of the Grand Gulf nuclear plant.

10

     c.     At STP Nuclear Operating Company, Cottle was the Chairman of the Board, President and CEO from 2000 to April 2003, and the President and CEO from 1997 to 2000.

23.    Defendant Paul J. Powers ("Powers") has been a director of FirstEnergy since 1997, and was a director at subsidiary Ohio Edison from 1992 to 1997.

     a.     He is also a director of GlobalSantaFe Corp., Twin Disc, Inc., and YORK International Corp. ("YORK"), of which defendant Pokelwaldt was previously the Chairman of the Board and CEO.

     b.     Powers joined Commercial Intertech in 1982 as Group Vice President of Hydraulics, was elected President and COO in 1984, and was elected Chairman of the Board and CEO in 1987.

     c.     Powers is a member of the Finance Committee of FirstEnergy's Board which is responsible for monitoring and overseeing the Company's financial resources and strategies.

24.    Defendant George M. Smart ("Smart") has been a director of FirstEnergy since 1997, and was a director of subsidiary Ohio Edison from 1988 to 1997. On January 20, 2004, the Board elected Smart as Chairman of the Board.

     a.     Smart has been a director of UNB Corp. since 2000, of which defendant Maier has also been a director since 1997.

     b.     Smart is a former director of Belden & Blake Corp., a North Canton, Ohio company that explores for natural gas and oil in the Appalachian and Michigan Basins. In November 1999, FirstEnergy acquired Belden Energy Services Company, a subsidiary of Belden & Blake that sells natural gas to retail customers in Ohio. Belden Energy Services had 1998

revenues of approximately $44 million.  In the first quarter of 1998, FirstEnergy and Belden & Blake created an equally owned venture called FE Holdings LLC to acquire natural gas properties.

     c.    Smart is the Chair of the Audit Committee of FirstEnergy's Board which is responsible for reviewing the adequacy of internal financial controls.

     d.    Smart is a member of the Compensation Committee of FirstEnergy's Board which is responsible for recommending the compensation of the five highest paid executive officers, reviewing and endorsing a compensation philosophy that supports competitive pay for performance and is consistent with the corporate strategy, and assisting the Board in establishing appropriate incentive compensation and equity based plans.

    25.    Defendant Patricia K. Woolf ("Woolf") has been a director of FirstEnergy since 2001, and was a director of subsidiary GPU from 1983 to 2001.  Woolf is also a Director of Crompton Corporation.

     a.    Woolf is a member of the Corporate Governance Committee of FirstEnergy's Board which is responsible for the development, administration, and recommendation to the Board of the Company's corporate governance.

     b.    Woolf is a member of the Nuclear Committee of FirstEnergy's Board which is responsible for monitoring and safeguarding the Company's nuclear operations, including the operation of all nuclear units, and their safety, reliability, and quality.

     c.    As of February 28, 2003, Woolf held 12,789 shares of FirstEnergy's common stock.

    26.    Defendant Robert B. Heisler, Jr. ("Heisler") has been a director of FirstEnergy since 1998.

     a.     Heisler has been Chairman of the Board and CEO of Key Bank National Association since 2001, of which defendant Cartwright has been a director; and Executive Vice President of KeyCorp since 1996, of which defendant Cartwright is a director, and with whom FirstEnergy has had a business relationship.  He was also President of Key Capital Partners from 1997 to 2000.

     b.     In June 2003, Heisler was named as one of eleven founding members of "Team NEO," a regional economic development group led by FirstEnergy's then-CEO, Peter Burg.

     c.     Heisler is a member of the Corporate Governance Committee of FirstEnergy's Board which is responsible for the development, administration, and recommendation to the Board of the Company's corporate governance.

     d.     Heisler is a member of the Compensation Committee of FirstEnergy's Board which is responsible for recommending the compensation of the five highest paid executive officers, reviewing and endorsing a compensation philosophy that supports competitive pay for performance and is consistent with the corporate strategy, and assisting the Board in establishing appropriate incentive compensation and equity based plans.

     e.     As of February 28, 2003, Heisler held 16,320 shares of FirstEnergy's common stock.

27.     Defendant Robert L. Loughhead ("Loughhead") has been a director of FirstEnergy since 1997, and was a director of subsidiary Ohio Edison from 1980 to 1997.

     a.     Loughhead was an executive in the steel industry for 28 years.  He retired from the steel industry in 1987 as Chairman of the Board and CEO of Weirton Steel Corporation, which he had joined in 1983.

13

b.     Loughhead is a member of the Audit Committee of FirstEnergy's Board which is responsible for reviewing the adequacy of internal financial controls.

c.     Loughhead is a member of the Finance Committee of FirstEnergy's Board which is responsible for monitoring and overseeing the Company's financial resources and strategies.

d.     As of the February 28, 2003, Loughhead held 8,664 shares of FirstEnergy common stock.

28.    Defendant John M. Pietruski ("Pietruski") has been a director of FirstEnergy since 2001, and was a director of subsidiary GPU from 1989-2001.

a.     Since 1990 Pietruski has been Chairman of the Board of Texas Biotechnology Corporation. He is also President of Dansara Company, an investment consulting firm. Pietruski recently retired from the boards of Hershey Foods Corporation and Lincoln National Corporation. Since May 1998 he served on the board of PDI Inc. Pietruski was President and COO of Sterling Drug from 1983 to 1985 and Chairman of the Board and CEO from 1985 to 1988.

b.     Pietruski is a member of the Compensation Committee of FirstEnergy's Board which is responsible for recommending the compensation of the five highest paid executive officers, reviewing and endorsing a compensation philosophy that supports competitive pay for performance and is consistent with the corporate strategy, and assisting the Board in establishing appropriate incentive compensation and equity based plans.

c.     Pietruski is a member of the Finance Committee of FirstEnergy's Board which is responsible for monitoring and overseeing the Company's financial resources and strategies.

14

        d.      As of February 28, 2003, Pietruski held 15,236 shares of FirstEnergy common stock.

29.     Defendant Catherine A. Rein ("Rein") has been a director of FirstEnergy since 2001, and was a director of subsidiary GPU from 1989 to 2001.

        a.      Since 1981, Rein has been a director of Bank of New York, an entity that has done lending business with FirstEnergy, as set forth in detail below.

        b.      Rein has also been a director of New England Financial, which is affiliated with Met Life.  Since 1999, she has been President and CEO of Met Life's property and casualty insurance division, and since 1989 she has been an Executive Vice President of Met Life.  She was also a director of Corning Inc.

        c.      Rein is a member of the Audit Committee of FirstEnergy's Board which is responsible for reviewing the adequacy of internal financial controls.

        d.      Rein is a member of the Compensation Committee of FirstEnergy's Board which is responsible for recommending the compensation of the five highest paid executive officers, reviewing and endorsing a compensation philosophy that supports competitive pay for performance and is consistent with the corporate strategy, and assisting the Board in establishing appropriate incentive compensation and equity based plans.

        e.      As of February 28, 2003, Rein held 11,883 shares of FirstEnergy common stock.

30.     Defendant Robert C. Savage ("Savage") has been a director of FirstEnergy since 1997, and was a director of predecessor Centerior Energy from 1990 to 1997.

        a.      Savage has been President and CEO of Savage & Associates, Inc. since 1973.  Savage has served as a director of at least eleven business organizations, including

15

Charter One Bank, Solar Cells, Inc., Columbus Life Insurance Company, and Cedar Fair Management Company.

      b.     Savage is a member of the Finance Committee of FirstEnergy's Board which is responsible for monitoring and overseeing the Company's financial resources and strategies.

      c.     Savage is a member of the Nuclear Committee of FirstEnergy's Board which is responsible for monitoring and safeguarding the Company's nuclear operations, including the operation of all nuclear units, and their safety, reliability, and quality.

      d.     As of February 28, 2003, Savage held 12,593 shares of FirstEnergy common stock.

      31.     Defendant Russell W. Maier ("Maier") has been a director of FirstEnergy since 1997, and was a director of subsidiary Ohio Edison from 1995 to 1997.

      a.     Maier was an Executive Vice President and COO at Republic Steel, of which defendant Cartwright was also a director from at least 1997 to 1998.

      b.     Maier was also the President of LTV Steel, and the President and CEO of Michigan Seamless Tube.

      c.     Maier has been a director of UNB Corp. since 1997, of which defendant Smart was also a director since 2000.

      d.     Maier is a member of the Audit Committee of FirstEnergy's Board which is responsible for reviewing the adequacy of internal financial controls.

      e.     Maier is a member of the Nuclear Committee of FirstEnergy's Board which is responsible for monitoring and safeguarding the Company's nuclear operations, including the operation of all nuclear units, and their safety, reliability, and quality.

f.     As of February 28, 2003, Maier held 13,188 shares of FirstEnergy common stock.

32.     Defendant Robert N. Pokelwaldt ("Pokelwaldt") has been a director of FirstEnergy since 2001, and was a director of subsidiary GPU Inc. from 2000 to 2001.

a.     Pokelwaldt is also a director of Carpenter Technology Corp., Intersil Corp., and Mohawk Industries.  Pokelwaldt was also Chairman of the Board and CEO of Frick Co.

b.     From 1993 through 1999, Pokelwaldt was Chairman of the Board and CEO of YORK, of which defendant Powers is also a director.  From 1991 to 1993, Pokelwaldt was President and COO of YORK.

c.     Pokelwaldt is a member of the Audit Committee of FirstEnergy's Board which is responsible for reviewing the adequacy of internal financial controls.

d.     Pokelwaldt is a member of the Finance Committee of FirstEnergy's Board which is responsible for monitoring and overseeing the Company's financial resources and strategies.

e.     As of February 28, 2003, Pokelwaldt held 3,439 shares of FirstEnergy common stock.

33.     Defendant Jesse T. Williams, Sr. ("Williams") has been a director of FirstEnergy since 1997, and was a director of subsidiary Ohio Edison from 1992 to 1997.

a.     In 1998, Williams retired as Vice President of Human Resources Policy, Employment Practices and Systems of The Goodyear Tire & Rubber Company.

17

      b.     Williams is a member of the Corporate Governance Committee of FirstEnergy's Board which is responsible for the development, administration, and recommendation to the Board of the Company's corporate governance.

      c.     Williams is a member of the Nuclear Committee of FirstEnergy's Board which is responsible for monitoring and safeguarding the Company's nuclear operations, including the operation of all nuclear units, and their safety, reliability, and quality.

      d.     As of February 28, 2003, Williams held 8,164 shares of FirstEnergy common stock.

34.     The Defendants identified in ¶¶ 19-33 are referred to herein as the "Directors."

## SUBSTANTIVE ALLEGATIONS

**Davis-Besse Nuclear Power Station**

35.     The Directors failed to properly monitor the safety conditions of Davis-Besse until, according to an August 22, 2003 *New York Times* article, it became "the most serious nuclear plant incident in the nation since the Three Mile Island accident in 1979."

36.     The Directors, through their action and inaction, promoted a fundamentally flawed safety culture that valued power production over safety to the point that the plant was operated in an extremely dangerous manner.  Since at least 1998, the Company did not give employees – who were assigned with the task of ensuring that the nuclear reactor vessel head was intact, that there were no cracks in the vessel head, and that there were no leaks – adequate time to complete safety inspections during refueling closures.  FirstEnergy wanted to minimize the refueling time so that Davis-Besse could get back on line generating power and money.

37.     The culture created by the Board had a profound impact on the operation and maintenance of the Davis-Besse reactor vessel head.  For a period of four years from 1998 to

2002, the Company allowed boric acid to eat a football sized hole through over six inches of the carbon steel reactor head. Over 900 pounds of boric acid corrosion were allowed to accumulate. The hole proceeded so far through the reactor head that less than 3/16 to 3/8 inch of stainless steel, bulging under the extreme pressure inside the reactor, prevented the vessel head from rupturing. "There was an unacceptable reduction in the margin of safety at the Davis-Besse plant," said Jim Dyer, regional administrator for the NRC's Chicago office that oversees Ohio nuclear plants. "The cladding wasn't designed to be pressure containing. But it did. That was fortunate."

38. According to Paul Gunter, director of the Reactor Project for the Nuclear Information and Resource Center, "FirstEnergy pushed this reactor beyond all reasonable safety margins . . . ."

39. According to NRC spokesperson Jan Strasma, "The corrosion problem in the head, or top, is a cause for concern . . . . It's a significant engineering problem. For Davis-Besse, it's significant."

40. Plant documents from 1998 stated that workers cleaned acid buildup from the lid and that inspections had shown the lid surface was free of "any" corrosion damage. A videotape of the 1998 inspection, however, showed fist-sized clumps of red, rusty acid on parts of the reactor lid, and Davis-Besse workers again allowed some of them to remain, especially on the hard-to-reach top of the dome. That precluded plant personnel from knowing, as they claimed to, that the underlying metal was intact. In fact, the hole in the lid had started its rapid growth that year in the very area workers had left uncleaned.

41. The NRC uncovered that workers examining the lid at the start of the 2000 outage found rock-hard, "lava-like" piles of acid that clogged some of the mouse holes and hindered the

video camera's path.  They did some cleaning, but with time running out, managers decided to stop, leaving some acid clumps in place and part of the lid unchecked.

42.     According to the Company's Probable Cause Summary Report filed with the NRC on March 22, 2002, there were signs as early as 1999 that the reactor head was corroding. In response to the report, Company spokesperson Todd Schneider admitted that in 2000 the Company decided not to modify insulation above the reactor head – which probably would have allowed workers to see the damage – because it had already decided to special-order a new head.

43.     In April 2002, FirstEnergy officials admitted that dirty air filters should have alerted them to potential problems at the plant.  FirstEnergy's Vice President Howard Bergendal admitted, "We could have and should have found it in previous inspections. . . .  It's our responsibility to expect the unexpected and we did not do this."

44.     Similarly, in December 2002, when James Powers, director of engineering at Davis-Besse, was asked, "Of the 26 potential safety concerns, were any of them identified previously and not resolved," James Powers and his colleagues admitted that some had been identified in the late 1990s but not resolved because the engineering staff did not have the resources.   James Powers admitted, "Yes, we could have done better [regarding safety concerns]."

45.     In July 2002, the Company admitted to NRC officials that "poor management" was a contributing factor to the major corrosion problem found at Davis-Besse.

46.     In October 2002, Lew Myers, COO of FirstEnergy Nuclear Operating Company admitted, "We did not handle the [safety] issue as well as we could have."

47.     FirstEnergy further admitted in a report to the NRC released in or about October 2002 that: "There was a focus on production, established by management, combined with taking

minimum actions to meet regulatory requirements, that resulted in the acceptance of degraded conditions. . . .  Personnel failed to correctly apply key industry information and plant knowledge about the potential harmful effects of boric acid."  FirstEnergy further admitted that "a mandatory incentive program rewards production more than safety at senior levels."  FirstEnergy management also admitted that from 1997 to 2000, "we provided a minimum amount of inspection . . . .  as a result of that the quality [of oversight] degraded."  Steve Loehlain, who headed a FirstEnergy team that examined the cause of the Davis-Besse damage explained, "We gave away the margin of safety."

48.    In the report to the NRC, the Company further claimed that plant personnel relied heavily on their belief that leakage of the control rod drive mechanism ("CRDM") nozzles was a low probability.  In response, the NRC noted that FirstEnergy's attitude was not just that CRDM cracking was unlikely to happen, but that it "can't happen" – a state of "complete denial."

49.    A December 30, 2002 report by the Office of the Inspector General regarding the NRC's regulation of Davis-Besse concluded that the NRC was unaware that there was a physically-confirmed leaking or cracked nozzle.  The NRC was unaware because FirstEnergy lied to, withheld critical information from, and otherwise misled the NRC regarding the operational problems at Davis-Besse.

50.    For example, in an attempt to avoid a mandatory reactor showdown, in 2002 the Company had been in discussions with the NRC to ascertain if potential safety problems existed at the plant.  Because of the construction and age of Davis-Besse, the NRC told the Company it believed it was likely that there was vertical cracking and possibly circumferential cracking around the nozzle protrusions through the reactor head, which would require repair or replacement of the reactor vessel head.

51.     Instead of revealing that the reactor vessel head was threatened by corrosion or taking steps to repair or replace the vessel head, FirstEnergy lied to and misled the NRC regarding Davis-Besse.  For example, during 2000 Davis-Besse personnel took photographs and made videotapes during the course of inspections of the reactor which clearly demonstrated the reactor was leaking.  An April 2000 photo – now referred to as the "Red Photo" – clearly demonstrated that rust-colored boric acid corrosion was leaking from inspection ports on the reactor's dome.  Other videotapes taken of the vessel head in 2000 also clearly showed signs of corrosion.  The Company never revealed this information when requested in 2000 or in 2001 when it was negotiating with the NRC over the mandatory closure of Davis-Besse after the NRC raised concerns about cracks and leaking.  After withholding the information, FirstEnergy stated that evidence such as the "Red Photo," that gave a more detailed indication of the lid's condition, was available if the NRC had looked hard enough.  "It was there for the asking," said Company spokesman Todd Schneider.

52.     In fact, from August 2001 through February 16, 2002, in numerous communications with the NRC, FirstEnergy stated that no known problems existed at Davis-Besse.  In order to purportedly prove the assertions that no problem existed, FirstEnergy provided the NRC with April 2000 photographs of the reactor head – and omitted the "Red Photo."  In addition, FirstEnergy withheld a report drafted by the lead engineer responsible for cleaning the reactor head.  In his report, the lead engineer described how he was only given one day to inspect the reactor head despite his findings, which he forwarded to management, that he had encountered deposits of hardened boric acid and attempted to remove these deposits with crowbars.  The lead engineer concluded that these deposits were "lava-like" and could not be removed with existing methods.  Instead of providing this information to the NRC, FirstEnergy

gave an adulterated copy of the lead engineer's report which did not indicate that the lead engineer was unable to clean the entire head.

53.     In March 1990, after finding boric acid residue from leaking coolant in several places, a Davis-Besse engineer recommended that larger ports be cut in the structure to allow for better inspection and cleaning and reminded his superiors of the acid's potential for harm. Managers finally decided in September 1993 that the modification was not necessary, according to the cancellation notice signed by four high-level managers because "cleaning of the reactor vessel head [lid] during the last three outages [in 1990, 1991 and 1993] was completed successfully without requiring access ports."  The NRC determined that conclusion was not accurate.  Agency inspectors who reviewed Davis-Besse records from the 1991 and 1993 refueling shutdowns found that workers had allowed acid deposits to remain on the lid each time the reactor was restarted.

54.     In April 2002, Bob Saunders, president of FirstEnergy Nuclear Operating Co., nevertheless claimed, "We have been open, honest and truthful . . . .  We are responsible to you, the public, and the NRC."

55.     In October 2002, the Company again claimed that it had made no deliberate effort to mislead the NRC, but admitted that its information gathering was "inadequate" even for its own purposes and likely resulted in the presentation of incorrect information to the NRC. FirstEnergy spokesperson Richard Wilkins admitted, "The picture was incomplete because we did not adhere to NRC standards, industry standards or our own standards."

56.     As part of the Company culture of sacrificing safety and maintenance for profits, FirstEnergy actively silenced employees who raised safety concerns and complained that they were not given adequate time to complete cleaning and inspection operations to ensure that

Davis-Besse was operating in a safe manner. In fact, the Board fostered a culture that so highly valued performance over safety that the plant management bonuses were tied to electricity production and cost containment at the expenses of safety. Indeed, government investigations into Davis-Besse reveal that employees not only felt unable to raise safety concerns for fear of losing their jobs, but employees were actually intimidated, harassed and terminated for raising safety concerns.

57.    In addition, FirstEnergy terminated the employment of the lead engineer responsible for cleaning the Davis-Besse reactor vessel head after he complained that he was not given adequate time to thoroughly clean and inspect the vessel head.

58.    Similarly, in mid-summer 2001, then-FirstEnergy employee, Andrew Siemaszko, recommended that the Company purchase for Davis-Besse an unused reactor vessel head at the Midland-Michigan reactor. He obtained a price quote from TechLink, Inc., on August 2, 2001, to purchase the replacement reactor for $3.5 million, plus $3 million for qualification of the head. He estimated that replacing the head would be less than the examination cost during the next several years. FirstEnergy rejected this suggestion and subsequently fired Siemaszko in retaliation for raising concerns about boric acid corrosion build-up.

59.    Similarly, according to a former Davis-Besse employee and NRC inspector, some Davis-Besse workers who raised safety concerns or stopped work for safety reasons had their tires slashed, were reprimanded by their supervisors and were verbally threatened by colleagues.

60.    The active cover-up of the problems at Davis-Besse reached the highest levels of the corporation hierarchy. The Directors were each kept advised of the problems at Davis-Besse by the "Nuclear Committee" of the Board of Directors, of which defendants Maier, Savage, Williams and Woolf were members. According to the Company's 2003 Proxy Statement,

committee members were responsible for monitoring and making recommendations to both management and the Board regarding nuclear matters, including the operation of all of FirstEnergy's nuclear units, and reviewing the safety, reliability, and quality of nuclear operations and the effectiveness of management systems for the identification of problems. In addition, defendant Cottle had substantial prior experience working for nuclear power projects, including the TVA's nuclear program. According to the *Houston Chronicle*, TVA's nuclear program (like FirstEnergy's), "suffered serious accidents, billions of dollars in cost overruns and far-reaching labor strife," and Cottle shared responsibility for TVA's "notorious and still-unopened Watts Bar plant from 1982 to 1985," as hundreds of workers alleged they had been intimidated and harassed for reporting safety problems.

61.    Defendant Alexander, who was the Company's highest operating officer, was named as a source of FirstEnergy's operational problems. Analyst Robert Rubin at Deutsche Bank explained, "Financially, the company has performed . . . . Operationally, it's a disaster. That points to Tony Alexander."

62.    On December 11, 2002, *The Plain Dealer* reported that a major concern of the NRC's oversight committee was whether Davis-Besse's management had remade itself and sufficiently changed the attitudes of plant personnel to be able to operate safely over the long run. According to Jack Grobe, Chairman of the NRC committee overseeing the Company's efforts to rebuild David-Besse, "It wasn't a hardware issue that caused the [reactor lid] to corrode over four to six years . . . . The indicators were clear. It was the safety culture of the plant that caused that to happen."

63.    On February 16, 2002, FirstEnergy closed Davis-Besse for what the Company called "routine maintenance." To date, the plant has yet to re-open.

64. Less than a month later, it was first revealed to the public that FirstEnergy workers found cracks in parts of a critical safety mechanism in the head of the Davis-Besse reactor vessel. Two weeks later it was reported that a second cavity, apparently caused by acid corrosion, had been found on a critical safety device at Davis-Besse. The second cavity on the vessel head was 1 ½ inches deep into the 6 3/8-inch thick carbon-and-stainless-steel structure that covers the radioactive fuel core.

65. In May 2002, NRC officials were surprised when FirstEnergy revealed for the first time that there was one more crack in one of the control rod sleeves than previously reported, prompting the NRC to question the integrity of the entire FirstEnergy report.

66. On November 22, 2003, the *Akron Beacon Journal* reported: "The [NRC] believes it has found evidence of criminal wrongdoing at FirstEnergy Corp.'s Davis-Besse nuclear plant, and as a result, a federal grand jury wants plant documents and records from the Akron utility."

67. On December 23, 2003, the *Akron Beacon Journal* revealed the NRC's reported findings on its latest inspection: "Those analysts who have questioned the effectiveness of top managers have at least one strong argument: Company officers must bear responsibility, no matter the layers separating their desks from the day-to-day operations at Davis-Besse."

68. On February 16, 2004, *USA Today* reported that the government may decide next week whether to allow the restart of Davis-Besse, after FirstEnergy spent about $500 million to correct problems at the facility. NRC spokesman Jan Strasma stated that a team of government inspectors found inadequate management oversight, failure of workers and management to follow procedures and poor communication among workers and management. According to

U.S. Attorney Greg White, an investigation into possible criminal matters at Davis-Besse is "still something ongoing."

69.    To date, Davis-Besse still has not reopened.  Meanwhile, including repair costs and the cost of buying replacement energy, the Davis-Besse incident has cost the Company in excess of $500 million and has significantly impacted the Company's financial results and reputation.  Indeed, as the Company announced on February 19, 2004, FirstEnergy's 2003 earnings alone were impacted by $289 million of maintenance and replacement power expenses related to the extended outage at Davis-Besse, reducing net income by $170 million, or $0.56 per share of common stock.

**The Blackout**

70.    On August 14, 2003, the United States and Canada experienced the largest blackout in history, with power being interrupted in Ohio, Michigan, New York, New Jersey, Pennsylvania, Connecticut, Massachusetts, Ontario and Quebec.  Information reviewed in connection with governmental investigations into the cause of the blackout (including second-by-second data on the conditions of some lines and records of conversations among grid operators) suggests that the troubles began in the transmission territory of FirstEnergy.  Indeed, on August 20, 2003, *The Wall Street Journal* quoted Ohio Representative, Dennis Kucinich, as stating he would file a petition before the Public Utilities Commission of Ohio to revoke FirstEnergy's operating license, citing "mismanagement and a climate of putting profit above public interest."  He filed the petition on August 20, 2003.  Moreover, on January 16, 2004, the Pennsylvania Public Utilities Commission launched an investigation of Metropolitan Edison Company, Pennsylvania Electric Company, and Pennsylvania Power Company (all subsidiaries of FirstEnergy), because their service reliability "may have fallen below established standards."

27

71.     On August 18, 2003, a class action lawsuit on behalf of people damaged by the August 14 blackout was filed, exposing the Company to billions of dollars in liability and millions of dollars in legal fees.  The complaint charges FirstEnergy with recklessly causing the blackout by:  (i) failing to have a functioning alarm that could have timely alerted controllers to trouble with its power lines; (ii) failing to cut back tree limbs that came into contact with power lines, which resulted in the tripping of the power lines; and (iii) failing to maintain a failsafe system that could have isolated the local power grid from the nationwide network.  By disregarding these basic and fundamental industry practices, the Board has exposed the Company to billions of dollars of potential liabilities.

72.     FirstEnergy's failures with regard to the blackout are particularly egregious in light of the fact that, as revealed in an August 21, 2003 *New York Times* article, three months before the blackout, the agency charged with protecting the nation's electrical grid (the North American Electric Reliability Council) put industry officials, including FirstEnergy, on notice that the section of the grid covering Ohio and other parts of the Midwest were particularly vulnerable to the kind of "cascading events" that occurred.  The mention in the report of potential cascading power failures in the region was a significant warning.  "Our reliability assessments don't mention problems lightly," the article quoted Ellen Vancko, a spokeswoman for the group, as stating.

73.     The Company's failure to upgrade its transmission system resulted in an increase in the frequency and duration of blackouts in Ohio.  Indeed, the Company had been responsible for more blackouts in Ohio in the first half 2003 than all of 2002, and the repeated power failures by FirstEnergy led to complaints by northern Ohio mayors to state regulators, forcing some to buy diesel-powered generators for municipal buildings.  However, in the three years since

deregulation legislation passed in Ohio, FirstEnergy's spending on maintaining its high-voltage transmission lines in Ohio had remained all but flat. The decision not to increase such spending came as industry groups and government regulators were warning that the grid system in the Midwest, including FirstEnergy's territory, could become a choke point in a summer power surge. An August 22, 2003 *New York Times* article quoted State Senator Eric D. Fingerhut as stating, "[t]his has always been a utility that has dug in and supported the status quo, not wanting to modernize, not wanting to make investments."

74.   Likewise, FirstEnergy's New Jersey subsidiary suffered frequent blackouts and was accused of inadequate maintenance and allowing stray electricity to run through the ground, leaving residents of Brick, New Jersey, "tingling" when they stepped into pools and Jacuzzis. Investigators determined that deteriorated power lines owned and operated by FirstEnergy and improper grounding, combined with the extremely dry conditions, were the most likely causes. This same section of New Jersey was outraged when a power failure during the July 4, 2003 weekend left thousands of vacationers without power.

75.   A chronology of events leading to the August 14, 2003 blackout revealed that the problems began at 2:00 p.m. with the shutdown of a generator at FirstEnergy's Eastlake power plant. Later, power was lost to various transmission lines, and at 3:32 p.m., one such line shorted out when it sagged near a tree, putting an enormous strain on other lines. Lines in central Michigan overloaded and failed, causing plants to shut down. Eastern Michigan tried unsuccessfully to supply FirstEnergy's needs and blacked out. At 4:11 p.m., FirstEnergy's system went down, blacking out parts of northern Ohio. Ontario, which had been importing power from Eastern Michigan, suddenly found itself exporting power and could not maintain its system, forcing it to black out. New York then isolated itself from Ontario, but since it had been

exporting power to Ontario, it was making more power than it needed, causing excess power overloads and subsequent blackouts.

76.     On August 24, 2003, *The New York Times* reported that FirstEnergy had not only ignored regulators' warnings that its antiquated grid could falter, but that it also ignored shareholder demands that its executives improve the Company's governance practices.   The persistent dismissal of shareholders' concerns about its "entrenched board" is one of the numerous signs of complacency by the Company, its management and the Board.

77.     A September 4, 2003, *CBS Market Watch* quoted portions of a House Energy and Commerce Committee transcript of telephone conversations between FirstEnergy control room personnel and the Midwest region's power grid operators.   The exchange reveals that FirstEnergy could not get a handle on the situation in part because its computer had malfunctioned, leaving control room employees clueless as to what was happening and how to react in the early stages of what snowballed into the international blackout:

> The House committee on Wednesday released a transcript of telephone calls between FirstEnergy and the Midwest region's power grid operator which showed growing chaos and confusion in FirstEnergy's control room in the hours before the blackout.

> "We have no clue, our computer is giving us fits too.  We don't even know the status of some of the stuff around us," an operator at Akron, Ohio-based FirstEnergy said.

78.     A joint U.S. and Canada Power Systems Outage Task Force was established to investigate the causes of the blackout.   An interim report was released by the Task Force in November of 2003.   The Task Force categorized the primary power outage causes into three groups.

a.     Group 1.  There was inadequate situational awareness at FirstEnergy.  In particular, the Task Force pointed out that:  (i)  FirstEnergy lacked procedures to ensure the

security of FirstEnergy's transmission system after significant unforeseen contingencies; (ii) FirstEnergy lacked procedures to ensure that their operators were continually aware of the functional state of their critical monitoring terminals; (iii) FirstEnergy lacked procedures to test effectively the functional state of these terminals after repairs were made; and (iv) FirstEnergy did not have adequate back up monitoring tools for high level visualization of the status of their transmission system.

      b.     Group 2.  FirstEnergy failed to manage tree growth in its transmission right-of-way.

      c.     Group 3.  Failure of the inter-connected grids' reliability organization to provide effective diagnostic support.

79.    FirstEnergy was the principal cause of Group 1 and 2 failures, and also contributed to the Group 3's failure in that critical real time data that should have been provided to the interconnected grids' reliability organization was not provided by FirstEnergy.

80.    The Task Force also identified six violations of North American Electric Reliability Counsel (NERC) standards.  The first 4 violations were attributed to FirstEnergy.

**Violation Number 1.**  Following the outage of the Chamberlin-Harding 345-kV line, FirstEnergy did not take the necessary actions to return the system to a safe operating state within 30 minutes.

**Violation Number 2.**  FirstEnergy did not notify other systems of impending system emergency.

**Violation Number 3.**  FirstEnergy's state estimation/contingency analysis tools were not used to assess the system conditions.

**Violation Number 4.**  FirstEnergy operator training was inadequate for maintaining reliable operation.

31

81.     The Task Force also stated that the continuing outage of the Davis-Besse nuclear plant contributed to the depletion of critical electricity capacity resources needed to operate under stressed conditions.

**The Restatement of Earnings**

82.     The mismanagement of FirstEnergy extended well past its basic operations to its financial reporting.  On August 5, 2003, the Company reported that it would have to restate its financial results for fiscal year 2002 and the first quarter of 2003 to reflect implementation of changed accounting treatments regarding the recovery of transition assets in Ohio and recognition of above-market values of certain leased generation facilities.  The Company stated that the restatements would reflect non-cash expenses only and were expected to reduce FirstEnergy's earnings per share by $0.23 to $1.92 ($1.91 diluted) for 2002 and to lower the Company's 2003 earnings by $0.17 per share compared with the Company's original guidance.

83.     The restatements of its full-year 2002 and first quarter 2003 results adversely affected the Company's reputation and added to the Company's mounting list of troubles.  "This problem is of a different kind but it has to do with management saying one thing and never being able to have what they say actually happen," said Jefferies and Company analyst Paul Fremont.

84.     On August 7, 2003, merely two days after announcing the first restatement, FirstEnergy announced that "upon further consideration with its independent auditor," its restatement would be broadened.  The Company stated in a press release:

> FirstEnergy announced today that, upon further consideration with its independent auditor, PricewaterhouseCoopers LLP (PwC), it is appropriate to recognize the impact of the implementation of changed accounting treatments in the financial statements of its Cleveland Electric Illuminating (CEI) and Toledo Edison (TE) subsidiaries for the year 2000, as well as the years 2001 and 2002, as reported on August 5.  The restatements reflect non-cash expenses only and are related to the recovery of transition assets and recognition of above-market values of certain leased generation facilities for those subsidiaries.

32

FirstEnergy and PwC originally expected to include the cumulative impact of related accounting adjustments for the years 1997 through 2000 in restated 2001 results for CEI and TE.  Upon further review, it was determined that the cumulative adjustment for the years 1997 through 1999 should not be reflected in the results of operations for 2001, but in the beginning balance of related items for 2000.  The restatement of that year is not expected to change the previously reported financial impact of the accounting adjustments.

85.    Less than two weeks later, on August 19, 2003, FirstEnergy disclosed that the amount of the restatement for 2002 was $0.26 per share, $0.03 more than had previously been announced.

86.    On September 12, 2003, FirstEnergy announced that it received a request from the SEC for documents and information relating to the restatement.  FirstEnergy will need to divert time, energy and money from its main business and operations to respond to the SEC and shareholder class action complaints.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

87.    Lead Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress injuries suffered, and to be suffered, by FirstEnergy as a direct result of the breaches of fiduciary duties, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as aiding and abetting thereof, by the Directors.  FirstEnergy is named as a nominal defendant solely in a derivative capacity.

88.    Lead Plaintiffs will adequately and fairly represent the interests of FirstEnergy in enforcing and prosecuting its rights.

89.    Lead Plaintiffs were and are owners of the stock of FirstEnergy during times relevant to the wrongful conduct alleged herein, and remain shareholders of the Company.

90.    The current Board of FirstEnergy consists of the following fifteen individuals, all of whom are defendants in this action:  Alexander, Addison, Cartwright, Cottle, Powers, Smart,

33

Woolf, Heisler, Loughhead, Pietruski, Rein, Savage, Maier, Pokelwaldt, and Williams.  Lead Plaintiffs have not made any demand on the present Board to institute this action because such a demand would have been futile for the following reasons:

a.     The Board is entrenched and the Directors have multiple conflicts of interest and entangling business relationships that preclude them from being disinterested and vigorously prosecuting the wrongdoing alleged herein:

i.     Ten of FirstEnergy's fifteen directors have been members of the Board or one of its units for 10 years or more;

ii.     Seven directors have previously served as directors of Ohio Edison Company, one of the Company's acquisitions and current subsidiaries:  Cartwright (1992-1997);  Powers (1992-1997);  Smart (1988-1997);  Loughhead (1980-1997);  Alexander (since 1989), Maier (1995-1997), and Williams (1992-1997);

iii.     Four directors have previously served as directors of GPU Power, Inc., one of the Company's acquisitions and current subsidiaries:  Woolf (1983-2001); Pietruski (1989-2001); Rein (1989-2001) and Pokewaldt (2000-2001);

iv.     Rather than recruiting external leadership when H. Peter Burg, FirstEnergy's former CEO, passed away on January 13, 2004, the Board quickly appointed defendant Alexander.  According to *The Plain Dealer*, executive recruiting firms have explained that the Board's quick appointment of Alexander is a "lost opportunity," and that "The [B]oard has really failed its shareholders and the industry by not recruiting the external leadership that the company needs right now;"

v.     Until 2002, defendant Addison was a Managing Director at CitiGroup, with whom FirstEnergy has an extensive banking relationship, including the

34

following:  (i) CitiGroup was co-lead underwriter of FirstEnergy's common stock public offering on or about September 11, 2003, in which the Company raised more than $840 million; (ii) CitiGroup was co-lead arranger of FirstEnergy's November 2002 renewal of a $1 billion 364-day credit facility; (iii) in April 2002, CitiGroup co-managed a $320 million securitization for a subsidiary of FirstEnergy (Jersey Central Power & Light Company); and (iv) CitiGroup served as financial adviser to GPU in its merger with FirstEnergy.  By virtue of his relationship with CitiGroup, his personal participation in the wrongful conduct, his substantial likelihood of liability alleged in this Complaint, and the influence of other Board members, Addison is not independent, not disinterested, and could not have appropriately considered a shareholder demand;

    vi. Defendant Cartwright is a member of the Compensation Committee of the Board.  As of February 28, 2003, Cartwright owned 14,208 shares of FirstEnergy common stock.  Cartwright is also a former director of Republic Steel, of which defendant Maier was an Executive Vice President and COO.  Moreover, since 1991 Cartwright has been a director of KeyCorp, of which defendant Heisler is the Executive Vice President, or KeyBank, of which defendant Heisler is the CEO and Chairman of the Board.  Since 1991, Cartwright has been President of Kent State University, with whom FirstEnergy has a Master Energy Services Agreement pursuant to which FirstEnergy serves as Kent State's energy manager and to which First Energy Foundation has donated hundreds of thousands of dollars over the past three years.  Cartwright is also a director of Davey Tree Expert Company, a commercial grounds and tree management company that removes trees and vegetation out of the way of power lines for utility companies.  By virtue of her intertwining board membership with fellow directors Heisler and Maier, affiliation with Kent State University, stock ownership,

personal participation in the wrongful conduct, substantial likelihood of liability alleged in this Complaint, and the influence of other Board members, defendant Cartwright is not independent, not disinterested, and could not have appropriately considered a shareholder demand;

       vii.     Defendant Cottle has substantial prior experience working for nuclear power projects.  For example, Cottle worked with the TVA's nuclear program from 1980 to 1987, first as a site director at Watts Bar, and then as an assistant to the agency's manager of nuclear power.    According to the *Houston Chronicle,* TVA's nuclear program (like FirstEnergy's), "suffered serious accidents, billions of dollars in cost overruns and far-reaching labor strife," and Cottle shared responsibility for TVA's "notorious and still-unopened Watts Bar plant from 1982 to 1985," as hundreds of workers alleged they had been intimidated and harassed for reporting safety problems.  Cottle also worked for HL&P's nuclear program where he managed HL&P's South Texas nuclear plant, and for Entergy Operations Inc. where he was in charge of the Grand Gulf nuclear plant.  At STP Nuclear Operating Company, Cottle was the Chairman of the Board, President and CEO from 2000 to April 2003, and the President and CEO from 1997 to 2000.  By virtue of his personal participation in the wrongful conduct, his substantial likelihood of liability alleged in the Complaint arising in part from his extensive experience in the nuclear power industry, and the influence of other Board members, Cottle is not independent, not disinterested, and could not have appropriately considered a shareholder demand;

       viii.     Defendant Powers is a director of YORK, of which defendant Pokelwaldt was previously the Chairman of the Board and CEO.  Powers is a member of the Finance Committee of FirstEnergy's Board which is responsible for monitoring and overseeing the Company's financial resources and strategies.    By virtue of his intertwining board

36

membership with fellow director Pokewaldt, his personal participation in the wrongful conduct, his substantial likelihood of liability alleged in this Complaint, and the influence of other Board members, Powers is not independent, not disinterested, and could not have appropriately considered a shareholder demand;

ix.     Defendant Smart has been a director of UNB Corp. since 2000, of which defendant Maier has also been a director since 1997. Smart is a former director of Belden & Blake Corp., a North Canton, Ohio company that explores for natural gas and oil in the Appalachian and Michigan Basins. In November 1999, FirstEnergy acquired Belden Energy Services Company, a subsidiary of Belden & Blake that sells natural gas to retail customers in Ohio. In the first quarter of 1998, FirstEnergy and Belden & Blake created an equally owned venture called FE Holdings LLC to acquire natural gas properties. Smart is a member of the Audit Committee of the Board. By virtue of his intertwining board membership with fellow defendant Maier, FirstEnergy's acquisition of Belden Energy Services Company, his personal participation in the wrongful conduct, his substantial likelihood of liability alleged in this Complaint, and the influence of other Board members, Smart is not independent, not disinterested, and could not have appropriately considered a shareholder demand;

x.     Defendant Heisler sits on the Board's Compensation and Corporate Governance committees. He has been Chairman of the Board and CEO of Key Bank National Association since 2001, of which defendant Cartwright has been a director; and Executive Vice President of KeyCorp since 1996, of which defendant Cartwright is a director, and with whom FirstEnergy has had a business relationship. He was also President of Key Capital Partners from 1997 to 2000. In June 2003, Heisler was named as one of eleven founding members of "Team NEO," a regional economic development group led by FirstEnergy's then-

37

CEO, Peter Burg. As of February 28, 2003, Heisler held 16,320 shares of FirstEnergy's common stock. By virtue of his stock ownership, intertwining board relationship with fellow director Cartwright, relationship with KeyCorp, personal participation in the wrongful conduct, his substantial likelihood of liability alleged in this Complaint, and the influence of other Board members, Heisler is not independent, not disinterested, and could not have appropriately considered a shareholder demand;

xi.     Since 1981, defendant Rein has been a director of BONY, an entity that has a banking relationship with FirstEnergy, including the following: (i) BONY is a member of the bank syndicate extending a $1 billion 364-day revolving credit facility to FirstEnergy since November 2002; and (ii) BONY served as co-documentation agent for a $421 million letter of credit facility for three FirstEnergy subsidiaries in March 2002. Rein is a member of the Board's Audit and Compensation Committees. As of February 28, 2003, Rein held 11,883 shares of FirstEnergy common stock. By virtue of her stock ownership, directorship at BONY and its banking relationship with FirstEnergy, personal participation in the wrongful conduct, substantial likelihood of liability alleged in this Complaint, and the influence of other Board members, Rein is not independent, not disinterested, and could not have appropriately considered a shareholder demand;

xii.     Defendant Maier was an Executive Vice President and COO at Republic Steel, of which defendant Cartwright was also a director from at least 1997 to 1998. Maier has also been a director of UNB Corp. since 1997, of which defendant Smart was also a director since 2000. Maier is a member of the Audit and Nuclear Committees of the Board. As of the end of 2002, Maier held 13,188 shares of FirstEnergy common stock. By virtue of his intertwined board membership with fellow directors defendants Smart and Cartwright, his stock

ownership, personal participation in the wrongful conduct, substantial likelihood of liability alleged in this Complaint, and the influence of other Board members, Maier is not independent, not disinterested, and could not have appropriately considered a shareholder demand;

xiii.    From 1993 through 1999, defendant Pokelwaldt was Chairman of the Board and CEO of YORK, of which defendant Powers is also a director.  From 1991 to 1993, Pokelwaldt was President and COO of YORK.  Pokelwaldt is a member of the Audit and Finance Committees of the Board.  As of February 28, 2003, Pokelwaldt held 3,439 shares of FirstEnergy common stock.  By virtue of his intertwined board membership with fellow defendant Powers, his stock ownership, personal participation in the wrongful conduct, substantial likelihood of liability alleged in this Complaint, and the influence of other Board members, Pokelwaldt is not independent, not disinterested, and could not have appropriately considered a shareholder demand;

xiv.    Defendant Loughhead is a member of the Board's Audit and Finance Committees.  As of February 28, 2003, Loughhead held 8,664 shares of FirstEnergy common stock.  By virtue of his stock ownership, personal participation in the wrongful conduct, his substantial likelihood of liability alleged in this Complaint, and the influence of other Board members, Loughhead is not independent, not disinterested, and could not have appropriately considered a shareholder demand;

xv.    Defendant Pietruski is a member of the Compensation and Finance Committees of the Board.  As of February 28, 2003, Pietruski held 15,236 shares of FirstEnergy common stock.  By virtue of his stock ownership, personal participation in the wrongful conduct, his substantial likelihood of liability alleged in this Complaint, and the

influence of other Board members, Pietruski is not independent, not disinterested, and could not have appropriately considered a shareholder demand;

xvi.    Defendant Woolf serves on FirstEnergy's Corporate Governance and Nuclear committees. As of February 28, 2003, Woolf held 12,789 shares of FirstEnergy's common stock. By virtue of her stock ownership, personal participation in the wrongful conduct, substantial likelihood of liability alleged in this Complaint, and the influence of other Board members, Woolf is not independent, not disinterested, and could not have appropriately considered a shareholder demand;

xvii.    Defendant Savage is a member of Finance and Nuclear Committees of the Board. As of February 28, 2003, Savage held 12,593 shares of FirstEnergy common stock. By virtue of his stock ownership, personal participation in the wrongful conduct, substantial likelihood of liability alleged in this Complaint, and the influence of other Board members, Savage is not independent, not disinterested, and could not have appropriately considered a shareholder demand; and

xviii.    Defendant Williams is a member of the Board's Corporate Governance and Nuclear Committees. As of February 28, 2003, Williams held 8,164 shares of FirstEnergy common stock. By virtue of his stock ownership, personal participation in the wrongful conduct, substantial likelihood of liability alleged in this Complaint, and the influence of other Board members, Williams is not independent, not disinterested, and could not have appropriately considered a shareholder demand.

b.    The Board repeatedly ignored shareholder demands that its executives improve the Company's governance practices. Indeed, a majority of the Company's shareholders voted at least six times since 1999 for changes in corporate governance, and in each

40

case the Board failed to respond.  In addition, in 2003, more than half of FirstEnergy's voting shareholders favored rescinding the "poison pill" that prevents an unfriendly takeover and favored changing the Company's staggered board structure, despite the Board's recommendations against the proposals.  Moreover, the Board's repeated failure to institute adequate financial and operational controls over an extended period of time after numerous warnings of the deficiencies is evidence that the Board will not take any action against their colleagues and close friends on the Board and will continue to allow the Company to suffer harm without recompense;

        c.      The Directors are not disinterested or independent because they served on the Board during the time of the wrongdoing and participated in the wrongs complained of herein.  Moreover, given their egregious conduct and failure to act, and particularly in light of the existence of the criminal investigations, there is a substantial likelihood that each of the Directors will be held liable for the damages suffered and to be suffered by FirstEnergy as a result of the Directors' abdication of their fiduciary duties, rendering it impossible for the Directors to exercise independent objective judgment in deciding whether to bring this action, or whether to vigorously prosecute this action;

        d.      As officers and/or directors of FirstEnergy, the Directors owed a fiduciary obligation to FirstEnergy and its shareholders, which included the duty of loyalty and the duty of care.  The Directors had the duty to perform their duties in good faith, in a manner reasonably believed to be in or not opposed to the best interests of FirstEnergy, and to exercise due care and diligence in the management and administration of the affairs of FirstEnergy, as well as the use and preservation of its properties and assets.  Each Director breached the fiduciary duties owed to FirstEnergy and its shareholders in that they failed to prevent and correct the improper

financial statements and properly supervise the Company's operations.   Such breaches are incapable of ratification.  Because they abdicated their oversight responsibilities, these directors are personally liable for the conduct alleged herein.   FirstEnergy's Board, therefore, cannot exercise independent objective judgment in deciding whether to bring this action, or whether to vigorously prosecute this action, because its members are interested personally in the outcome, as it is their actions which have subjected FirstEnergy to billions of dollars in liability;

      e.    Defendants Loughhead, Maier, Pokelwaldt, Rein and Smart (chairman) are members of the Audit Committee.  The Audit Committee is responsible for:  (i) reviewing the adequacy of the Company's internal controls and the objectivity of financial reporting; (ii) reviewing the services performed by the independent auditor; (iii) reviewing the independent auditor's internal quality control procedures; and (iv) reviewing management's programs to monitor complaints with the Company's policies.  According to Generally Accepted Accounting Principles ("GAAP"), to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure.   Among other things, these defendants were required to: (i) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; and (ii) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are executed in accordance with management's authorization and recorded as necessary to permit preparation of financial statements in conformity with GAAP.   In attempting to fulfill its oversight responsibilities, the Audit Committee reviewed and discussed with management the audited financial statements to be included in the Company's Annual Report on Form 10-K for the year ended December 31, 2002.  In performing its review, the Audit Committee discussed the

propriety of the application of accounting principles by the Company, the reasonableness of significant judgments and estimates used in the preparation of the financial statements, and the clarity of disclosures in the financial statements. The Audit Committee also reviewed and discussed with the Company's independent auditors, PricewaterhouseCoopers LLP ("PwC"), their opinion on the conformity of the audited financial statements with GAAP. Based on the reviews and discussions conducted, the Audit Committee recommended to the Board that the audited financial statements be included in the Company's Annual Report on Form 10-K for the year ended December 31, 2002, for filing with the SEC. These defendants breached their duties by abdicating their responsibilities and failing to implement and maintain an adequate internal control system for the Company, resulting in the necessity to amend and restate the Company's financial results for the fiscal year ended December 31, 2002 and the quarter ended March 31, 2003. The misconduct of the members of the Audit Committee could not have been an exercise of good faith business judgment, and there is a substantial likelihood that these defendants will be personally liable for their breaches of fiduciary duty. As a result of these defendants' breach of their duties, any demand upon them is futile;

       f.    Defendants Maier, Savage, Williams and Woolf are members of the Nuclear Committee. The Nuclear Committee is responsible for monitoring and making recommendations to both management and the Board regarding nuclear matters, including the operation of all nuclear units in which any subsidiary of the Company has an ownership or leasehold interest, and reviewing the safety, reliability and quality of nuclear operations and the effectiveness of management systems for the identification of problems and potential problems. These defendants breached their duties by abdicating their responsibilities as alleged herein. The misconduct of the members of the Nuclear Committee could not have been an exercise of good

faith business judgment. Indeed, in response to a FirstEnergy report on problems at Davis-Besse, the NRC told FirstEnergy that it was "in complete denial" of the potentially dangerous conditions at Davis-Besse. FirstEnergy also reportedly lied to and misled the NRC regarding Davis-Besse. Thus, there is a substantial likelihood that these defendants will be personally liable for their breaches of fiduciary duty. As a result of these defendants' breach of their duties, any demand upon them is futile;

g. Defendants Cartwright, Heisler, Williams and Woolf are members of the Corporate Governance Committee. The Corporate Governance Committee is responsible for the development, administration, and recommendation to the Board of the Company's corporate governance principles. The Corporate Governance Committee is also charged with assessing the size, composition and makeup of the Board in light of the operating requirements of the Company and for developing, monitoring and recommending membership qualifications for the Board and all Board committees, including assessing director independence in light of the Company's corporate governance guidelines, and making recommendations to the Board concerning possible candidates to fill vacancies on the Board. These defendants breached their duties by abdicating their responsibilities as alleged herein. The misconduct of the members of the Corporate Governance Committee could not have been an exercise of good faith business judgment, and there is a substantial likelihood that these defendants will be personally liable for their breaches of fiduciary duty. As a result of these defendants' breach of their duties, any demand upon them is futile;

h. Defendants Cartwright, Heisler, Pietruski (chairman), Powers, Rein and Smart, are members of the Compensation Committee. The Compensation Committee is responsible for recommending the compensation of the five highest paid executive officers,

reviewing and endorsing a compensation philosophy that supports competitive pay for performance and is consistent with the corporate strategy, and assisting the Board in establishing appropriate incentive compensation and equity based plans.  These defendants breached their duties by abdicating their responsibilities and promoting a mandatory incentive program that rewarded production over safety.  The misconduct of the members of the Compensation Committee could not have been an exercise of good faith business judgment, and there is a substantial likelihood that these defendants will be personally liable for their breaches of fiduciary duty.  As a result of these defendants' breach of their duties, any demand upon them is futile;

      i.      Defendants Loughhead, Pietruski, Pokelwaldt, Powers, and Savage, are members of the Finance Committee.  The Finance Committee is responsible for monitoring and overseeing the Company's financial resources and strategies, reviewing dividend policy, capital structure policies, long-and short-term debt levels, the issuance of securities and other appropriate financial matters, and approving terms of sales of Company securities when the Board does not exercise such powers.  The Finance Committee also reviews the Company's financial forecasts, budgets, pension fund investments and corporate insurance coverage.  These defendants breached their duties by abdicating their responsibilities as alleged herein.  The misconduct of the members of the Finance Committee could not have been an exercise of good faith business judgment, and there is a substantial likelihood that these defendants will be personally liable for their breaches of fiduciary duty.  As a result of these defendants' breach of their duties, any demand upon them is futile;

      j.      The non-employee directors receive lucrative compensation for their service on FirstEnergy's board.  Non-employee directors receive: (i) an annual retainer of

$30,000 in cash and $40,000 in common stock, which may be deferred; (ii) $1,500 for each Board and Committee meeting attended; (iii) a fee of up to $1,500 for each day the director visits a Company office or facility (other than Board meetings) or attends an industry meeting at the Company's request; and (iv) reimbursement for expenses related to attending meetings.  In addition, the chair of each Committee receives an additional $5,000 annual retainer.  Given that the Board met 13 times in 2002, the total compensation for a chair of a committee was almost $100,000.  By virtue of the substantial monetary benefits derived from their service on the Board, the non-employee director defendants are legally incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action;

   k.  Defendant Alexander, as President and CEO, is an inside director of FirstEnergy and his principal professional occupation is his employment with the Company, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.  Alexander received $773,292, $917,189, and $925,877 in salary and bonus compensation in 2002, 2001, and 2000, respectively, and nearly $2.0 million in long-term compensation restricted stock during that time.  Alexander has been employed by FirstEnergy or one of its predecessor companies for 32 years, beginning in Ohio Edison's tax department in 1972.  As a result of his access to and review of internal corporate documents, conversations and connections with corporate officers, employees, and directors, and attendance at management and Board meetings, Alexander was in possession of adverse non-public information regarding the Company's operations and financial condition.  While in possession of this material adverse non-public information regarding the Company, defendant Alexander sold 40,000 shares of FirstEnergy common stock, or approximately 27% of his holdings, for proceeds of over $1.5 million.  Moreover, Alexander has been named as a source of FirstEnergy's operational

problems. For example, analyst Robert Rubin at New York-based Deutsche Bank told the *Akron Beacon Journal* in November that "Financially, the company has performed . . . . Operationally, it's a disaster. That points to Tony Alexander." In addition, Alexander signed certain of the false and misleading financial statements that were publicly disseminated. Alexander elevated his own financial interests in keeping the price of FirstEnergy stock artificially inflated, and in maintaining his principal occupation, over his obligation to monitor FirstEnergy's internal and operational controls. By virtue of his substantial stock holdings, his longstanding reliance on FirstEnergy for his livelihood, his personal participation in the wrongful conduct, and his substantial likelihood of liability alleged in this Complaint, Alexander is not independent, not disinterested, and could not have appropriately considered a shareholder demand. Accordingly, Alexander is legally incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action;

l. In order to bring this suit, all of the Directors would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

m. As a result of their access to and review of internal corporate documents, conversations and connections with corporate officers, employees, and directors, and attendance at management and/or Board meetings, each of the Directors knew the adverse non-public information regarding the false and misleading financial statements. Nonetheless, each of the Directors authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading

statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

n.   Any suit by the current directors of FirstEnergy to remedy these wrongs would likely expose the Directors and FirstEnergy to further violations of the securities laws which would result in civil actions being filed against one or more of the Directors, thus, they are conflicted in making any supposedly independent determination whether to sue themselves;

o.   FirstEnergy has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for FirstEnergy any part of the damages FirstEnergy suffered and will suffer thereby;

p.   If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations contained in class action complaints for violations of securities laws. These admissions would impair the defense of the class actions and greatly increase their personal liability in an amount likely to be in excess of any insurance coverage available to the Directors. The Directors would therefore be forced to take positions contrary to the defenses that will likely be asserted in the securities class actions. This they will not do. Thus, demand is futile; and

q.   FirstEnergy's officers and directors, including the Directors, protected themselves against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint with a directors' and officers' liability insurance policy the Company purchased with corporate funds, i.e., monies belonging to the stockholders of FirstEnergy. The policy contains a provision, known as an "insured versus insured exclusion," that eliminates coverage for any action brought directly by FirstEnergy or

any of the Directors, against the other Directors.  As a result, insurance coverage would cease if any of the Directors brought or authorized this suit against themselves or the other Directors.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.

91.     The current Board has failed and refused to seek to recover for FirstEnergy for any of the wrongdoing alleged by Lead Plaintiffs herein even though the Directors know of the claims and causes of action raised by Lead Plaintiffs here.

92.     Evidencing the Board's inability and/or refusal to independently consider a shareholder demand, the Derivative Investigation Committee (the "DIC") (purportedly established by the Board to conduct an independent investigation into the allegations of the initial complaints) is composed entirely of defendants named in this action.  Namely, defendants Cottle, Powers, Pietruski and Heisler are the sole members of the DIC.  As set forth herein, these directors suffer from debilitating conflicts which prevent them from exercising independent judgment.

93.     Lead Plaintiffs have not made any demand on shareholders of FirstEnergy to institute this action since such demand would be futile and useless because: (i)  FirstEnergy is a publicly held company with approximately 303 million shares outstanding and thousands of shareholders; (ii)  making demand on such a number of shareholders would be impossible for Lead Plaintiffs who have no way of finding out names, addresses or phone numbers of shareholders; and (iii) making such a demand would be prohibitively expensive, assuming all shareholders could be individually identified.

49

## COUNT ONE
## BREACH OF FIDUCIARY DUTY AGAINST THE DIRECTORS

94.     Lead Plaintiffs incorporate by reference all of the allegations contained in the foregoing paragraphs as if fully restated herein.

95.     Under Ohio law, as directors and officers of FirstEnergy, the Directors owed a fiduciary obligation to FirstEnergy and its shareholders, which included the duty of loyalty and the duty of care.  The Directors had the duty to perform their duties in good faith, in a manner reasonably believed to be in or not opposed to the best interests of FirstEnergy, and to exercise due care and diligence in the management and administration of the affairs of FirstEnergy, as well as the use and preservation of its properties and assets.  Their duty of loyalty included the obligation to refrain from self-dealing and to manage FirstEnergy in a fair, just, honest and equitable manner, acting in the furtherance of the best interests of FirstEnergy and its shareholders and not in furtherance of their own personal interests or benefit.  In addition, as directors of a public company, the Directors had a duty to promptly disseminate material, accurate and truthful information with respect to FirstEnergy's operations, financial condition and affairs.

96.     To discharge their duties, the officers and directors were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of FirstEnergy.  By virtue of such duties, the officers and directors were required, among other things, to:

        a.      Exercise reasonable control and supervision over the officers, employees, agents, business and operations of FirstEnergy;

        b.      Manage, conduct, supervise and direct the business affairs of FirstEnergy in accordance with applicable laws, rules and regulations and neither violate nor knowingly

permit any officer, director or employee of FirstEnergy to violate applicable laws, rules or regulations;

        c.      Be and remain informed as to the status of FirstEnergy's operations, assets and financial condition, and upon receipt of notice or information of imprudent, unsound or unlawful practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such practices and make such disclosures as necessary to comply with applicable laws, rules and regulations; and

        d.      Establish and maintain adequate and functioning systems of internal legal, financial and accounting controls.

      97.     As described in detail above, the Directors breached their fiduciary duties to FirstEnergy and its shareholders by, among other things:  (i) failing to adequately correct hazards and improper management policies discouraging employee reports of safety issues at Davis-Besse, after being informed of such hazards and management practices by regulatory bodies, employee complaints and otherwise, causing the Company to incur more than $500 million in remedial costs and subjecting the Company to a grand jury investigation; (ii) failing to take proper steps to prevent future power outages after experiencing numerous power outages caused by known inadequate equipment and maintenance and after receiving repeated warnings from regulators, causing the largest blackout in United States history; (iii) failing to hold officers accountable after their fraudulent and/or criminal conduct was revealed; (iv) failing to address repeated shareholders demands for improvement of governance practices; (v) manipulating FirstEnergy's earnings and financial information, causing a restatement of earnings; (vi) causing or permitting FirstEnergy to issue false and misleading public reports, thereby subjecting FirstEnergy to an investigation by the SEC and class actions lawsuits alleging FirstEnergy

engaged in violations of federal securities laws; (vii) causing FirstEnergy to overcompensate its officers who had knowledge that the published financial condition of FirstEnergy was not accurate; (viii) failing to establish and maintain proper internal controls over the legal and financial and accounting operations of the Company; and (ix) failing to adequately control and supervise the officers of the Company.

98.  The conduct of the Directors involves a knowing, deliberate and culpable violation of their fiduciary duties, the absence of good faith on their part, an abuse of discretion and/or a reckless disregard for the best interests of FirstEnergy and its shareholders.

99.  The business judgment rule is not available to the Directors because, among other things, they were not disinterested, they acted in bad faith, they had knowledge of improprieties and did not act on it, they engaged in violations of applicable laws and regulations and/or their conduct was egregious on its face.

100.  As a direct and proximate result of the Directors' breaches of their fiduciary duties, FirstEnergy has suffered and continues to incur substantial damages.

## COUNT TWO
## GROSS MISMANAGEMENT AND WASTE OF CORPORATE ASSETS BY THE DIRECTORS

101.  Lead Plaintiffs incorporate by reference all of the allegations contained in the foregoing paragraphs as if fully restated herein.

102.  Under Ohio law, the Directors, as directors and officers, are held strictly accountable and liable if corporate funds or property are wasted or mismanaged due to their breach of the duty of trust. As described in detail above, the Directors have wasted and mismanaged corporate assets by, among other things: (i) failing to correct known hazards and improper management polices at Davis-Besse, causing the Company to incur more than $500

million in remedial costs and subjecting the Company to a grand jury investigation; (ii) failing to take proper steps to prevent future power outages after experiencing numerous power outages caused by known inadequate equipment and maintenance and after receiving repeated warnings from regulators, causing the largest blackout in United States history and subjecting the Company to billions of dollars in liabilities; (iii) paying excessive compensation to certain executive officers when they know that the published financial results of the Company are inaccurate; and (iv) subjecting the Company to potential liability for, and incurring substantial expense in defending claims that FirstEnergy engaged in violations of laws and regulations. FirstEnergy received no tangible benefit from the Directors' mismanagement and waste of corporate assets.

103.    The conduct of the Directors involves a knowing, deliberate and culpable violation of their duties, bad faith, an abuse of discretion and/or a reckless disregard for the best interests of FirstEnergy and its shareholders.

104.    As a direct and proximate result of the Directors' mismanagement and waste of corporate assets, FirstEnergy has suffered and continues to incur substantial damages.

## COUNT THREE
## UNJUST ENRICHMENT AGAINST THE DIRECTORS

105.    Lead Plaintiffs incorporate by reference all of the allegations contained in the foregoing paragraphs as if fully restated herein.

106.    As a result of the breaches of fiduciary duties and other misconduct described in detail herein, the Directors have been unjustly enriched at the expense of FirstEnergy.  For example, in 2002, Defendant Alexander, as FirstEnergy's President and COO, received a salary of $648,523, a bonus of $124,769, reimbursement for income tax obligations of $12,571, restricted common stock awards valued at $274,425, stock options for 120,000 shares, Long-

Term Incentive Plan payouts of $664,455 and other benefits valued at $39,921. Likewise, the non-employee directors received lucrative compensation for their service on FirstEnergy's board. Indeed, given that the Board met 13 times in 2002, the total compensation for a chair of a committee was almost $100,000.

107.    All compensation and other benefits paid to the Directors were in exchange for their good faith, proper services as officers or directors of FirstEnergy. However, as described in detail above, these Directors did not properly perform their duties as officers or directors in good faith, but rather engaged in breaches of their fiduciary duties, illegal conduct and other misconduct to the substantial detriment of FirstEnergy. For example, FirstEnergy has and continues to incur substantial expense to defend itself in an SEC investigation, a grand jury investigation and several class action lawsuits alleging FirstEnergy violated federal securities laws. As a result of their breaches of fiduciary duties, mismanagement, corporate waste and other misconduct described herein, FirstEnergy received no benefit in exchange for the compensation paid for the services by the Directors, and, in fact, has suffered substantial harm from the improper conduct of the Directors.

108.    FirstEnergy has been damaged by the Directors' unjust enrichment, and the Directors should be required to disgorge the personal gains and profits they have otherwise unjustly obtained at the expense of FirstEnergy as a result of their violations of laws and other misconduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

A.    Declaring that the Directors breached their fiduciary duties, mismanaged FirstEnergy, caused corporate waste, were unjustly enriched and engaged in the other unlawful conduct described herein.

54

B.   Directing the Directors, jointly and severally, to remit to FirstEnergy all damages caused to FirstEnergy and to account for all losses and/or damages sustained by FirstEnergy as a result of the Directors' breaches of fiduciary duties, mismanagement, corporate waste, unjust enrichment and other wrongful conduct described herein.

C.   Directing disgorgement by the Directors of all bonuses, profits and other compensation by which the Directors were unjustly enriched at the expense of FirstEnergy as a result of their wrongful conduct described herein.

D.   An award of pre-judgment and post-judgment interest as allowed by law.

E.   An award of Lead Plaintiffs' attorneys' fees, expert witness fees, consultant fees and other costs and expenses incurred by Lead Plaintiffs related to this action.

F.   Such other relief as the Court may determine is just and equitable.

## JURY DEMAND

Lead Plaintiffs demand a trial by jury of all issues triable as of right by jury.

DATED:        February 23, 2004                    Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

/s/ Daniel L. Berger
Daniel L. Berger
Victoria Wilheim
1285 Avenue of the Americas
New York, New York 10019
Telephone: 212-554-1400
Facsimile: 212-554-1444

-and-

Blair Nicholas
Niki O'Neel
12544 High Bluff Drive
Suite 150
San Diego, CA  92130
Telephone: 858-793-0070
Facsimile: 858-793-0323

**WAITE, SCHNEIDER, BAYLESS &
CHESLEY CO., L.P.A.**

/s/ Stanley M. Chesley
/s/ James R. Cummins
Stanley M. Chesley (Ohio 0000852)
James R. Cummins (Ohio 0000861)
Melanie S. Corwin (Ohio 0064513)
1512 Fourth & Vine Tower
One West Fourth Street
Cincinnati, Ohio 45202
Telephone: 513-621-0267
Facsimile: 513-621-0262

*Counsel for Co-Lead Plaintiff Teachers' Retirement
System of Louisiana*


**WEISS & YOURMAN**

/s/ Joseph H. Weiss
Joseph H. Weiss
Jack I. Zwick
David C. Katz
551 Fifth Avenue, Suite 1600
New York, NY 10176
Telephone: 212-682-3025
Facsimile: 212-682-3010

*Counsel for Co-Lead Plaintiff Dr. Joseph Scheller*


81609.3

56

## VERIFICATION

I, William T. Reeves, Jr., hereby declare as follows:

I am General Counsel of the Teachers' Retirement System of Louisiana. I have read the foregoing Consolidated Amended Derivative Complaint and know the contents thereof. I am informed and believe the matters therein are true and accurate to the best of my personal knowledge, information and belief.

Executed this 23rd of February 2004.

William T. Reeves, Jr.

Sworn to and Subscribed before
me this 23 of February 2004.

Notary Public
ARTHUR STUART CAGLE, JR.  #5905

FEB-23-2004  11:47

## VERIFICATION

I, Joseph Scheller, declare under penalty of perjury as follows:  I am the named plaintiff in the action herein.  I have read the annexed Verified Consolidated Amended Derivative Complaint, know the contents thereof and the same are true and accurate to the best of my personal knowledge, information and belief.

Executed on: February 23, 2004

JOSEPH SCHELLER

## **CERTIFICATE OF SERVICE**

I certify that on February 23, 2004, a copy of the VERIFIED CONSOLIDATED

AMENDED DERIVATIVE COMPLAINT was filed electronically.  Notice of this filing will be sent

to all parties by operation of the Court's electronic filing system.  Parties may access this filing

through the Court's system.

/s/James R. Cummins
James R. Cummins (Ohio 0000861)
Counsel for Lead Plaintiff Teachers'
Retirement System of Louisiana